## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **DOUGLAS GOLDHABER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **CIVIL ACTION NO. 06-134J** |
| | ) | |
| **v.** | ) | |
| | ) | **JUDGE GIBSON** |
| **WILLIAM HIGGINS, BRIAN CLARK,** | ) | |
| **KEITH BOWSER, MICHAEL** | ) | |
| **GEORGE, KENNETH BENTON, PAUL** | ) | |
| **WYPIJEWSKI, BRADLEY E.** | ) | |
| **HERSHEY, and the BEDFORD** | ) | |
| **COUNTY PRISON BOARD,** | ) | |
| | ) | |
| **Defendants.** | ) | |

### MEMORANDUM OPINION and ORDER OF COURT

**GIBSON, J.**

### SYNOPSIS

This matter comes before the Court on the Motion to Dismiss filed by Defendant Michael

George ("Judge George") (Document No. 25), the Supplemental Motion to Dismiss filed by Defendants

William Higgins ("Higgins"), Brian Clark ("Clark"), Keith Bowser ("Bowser"), Paul Wypijewski

("Wypijewski"), and the Bedford County Prison Board ("Board") (Document No. 28), and the Motion

to Dismiss/Motion for Summary Judgment filed by Defendants Bradley E. Hershey ("Hershey") and

Kenneth Benton ("Benton") (Document No. 30). For the reasons that follow, the Motion to Dismiss

filed by Hershey and Benton (Document No. 30) will be granted, the Motion to Dismiss filed by

Higgins, Clark, Bowser, Wypijewski and the Board (Document No. 28) will be granted in part and

1

denied in part, and the Motion to Dismiss filed by Judge George will be denied without prejudice, pending the filing of a more definite statement by Goldhaber.

## BACKGROUND

The Plaintiff, Douglas Goldhaber ("Goldhaber"), commenced this action against the Defendants on June 7, 2006. (Document No. 1). The Defendants responded to Goldhaber's lawsuit by moving for the dismissal of the Complaint. (Document Nos. 12, 14 & 19). On August 22, 2006, Goldhaber filed an Amended Complaint against the Defendants. (Document No. 24). Thereafter, the Defendants filed the instant Motions to Dismiss. (Document Nos. 25, 28 & 30). Judge George filed a Motion for a Protective Order on February 7, 2007, seeking a stay of all discovery with respect to himself pending a determination by the Court as to whether he is entitled to judicial immunity. (Document No. 36). The Court issued a memorandum opinion on February 22, 2007, granting Judge George's Motion for a Protective Order. (Document No. 39). Discovery was stayed not only with respect to Judge George, but with respect to all of the Defendants. (Document No. 39). The Court reasoned that the litigation would be structured more efficiently if all of the Defendants were subject to any needed discovery according to the same timetable. (*Id.*, p. 3). On March 15, 2007, the Court dismissed the original Motions to Dismiss filed by the Defendants, explaining that the arguments raised by the Defendants would be addressed within the context of the new Motions to Dismiss, which were filed after Goldhaber filed his Amended Complaint. (Document No. 40). These Motions to Dismiss have been extensively briefed and, therefore, are the subject of this memorandum opinion. Since the matter comes before the Court in this context, the allegations contained in the Amended Complaint are assumed to be true. *Anza v. Ideal Steel Supply Corp.*, 126 S.Ct. 1991, 1994, 164 L.Ed.2d 720, 726 (2006); *Sutton v. United Air*

2

*Lines, Inc.*, 527 U.S. 471, 475, 119 S.Ct. 2139, 2143, 144 L.Ed.2d 450, 458 (1999).

This is a civil rights action brought by an attorney who alleges that he was the victim of a conspiracy to retaliate against him for seeking legal redress, to prevent him from benefitting from a work-release program during his incarceration, and to extend his incarceration beyond the minimum sentence that he expected to serve. (Document No. 24, pp. 1-3, ¶ 1). Goldhaber was arrested on April 9, 2004, and charged with the offense of driving after imbibing, which is a violation of 75 Pa.C.S. § 3802. (*Id.*, p. 4, ¶ 6).[1] During the previous nine and a half years, Goldhaber had worked as a criminal defense attorney in Bedford County, Pennsylvania. (*Id.*, ¶ 7). He spent approximately half of this time working for the Office of the Public Defender for Bedford County, serving as First Assistant Public Defender and as Chief Public Defender. *Id.* At some point during the end of 1999 or the beginning of 2000, Higgins was hired as an Assistant District Attorney in Bedford County. (*Id.*, ¶ 8).

Following the commencement of Higgins' employment with the District Attorney's Office, he and Goldhaber began to socialize on a regular basis. (*Id.*, ¶ 9). Goldhaber alleges that Higgins confided in him with respect to business dealings outside of the workplace. *Id.* According to Goldhaber's allegations, Higgins bragged about how he had convinced two elderly individuals, one of whom was male and one of whom was female, to transfer title to their homes to his name, his wife's name, and the name of a friend. (*Id.*, p. 5, ¶ 10). He indicated to Goldhaber that he would borrow money against these homes, use some of the money to make repairs, sell the homes, and then keep the balance of the money. (*Id.*, ¶ 11). Higgins bragged about moving these two elderly individuals to The Bedford County,

---

[1] The First Amended Complaint refers to this statute as "Driving after imbibing," but the correct statutory designation is "Driving under the influence of alcohol or controlled substance." *See* 75 Pa. C.S.A. §3802.

receiving their social security payments, and attempting to have their social security payments deposited directly into his personal bank account. (*Id.*, ¶ 12). Higgins told Goldhaber that he had placed the woman in the Everett Christian Home, even though she was Jewish, and that he had made the decision to have her cremated after her death (which violates Jewish customs) to decrease the funeral expenses and ensure a monetary windfall for himself. (*Id.*, ¶ 13). Goldhaber also learned, from Higgins, about romantic encounters that Higgins was supposedly having with women other than his wife. (*Id.*, pp. 5-6, ¶ 14).

In November 2003, Higgins was elected District Attorney of Bedford County. (*Id.*, p. 6, ¶ 15). Shortly thereafter, the relationship between Higgins and Goldhaber began to deteriorate. (*Id.*, ¶ 16). Goldhaber alleges that Higgins was uncomfortable with Goldhaber's knowledge of his alleged unethical conduct, and that Higgins would utter profanities at Goldhaber in the courtroom while court was not in session. (*Id.*). When Higgins took office, Goldhaber was representing the defendant in *Commonwealth v. Barnes* (No. 535 for the year 2003) in the Court of Common Pleas of Bedford County. (*Id.*, pp. 6-7, ¶ 17). Goldhaber had successfully negotiated a resolution of the case with Higgins' predecessor, but this resolution had not been presented to the court prior to Higgins' assumption of his duties as the District Attorney. *Id.* Higgins refused to honor the agreement, and a jury trial was held on March 9, 2004. *Id.* During one of the recesses, Higgins allegedly told Goldhaber that President Judge Daniel Lee Howsare of the Court of Common Pleas of Bedford County was engaged in inappropriate ex parte conduct in the *Barnes* case. *Id.* Judge Howsare was presiding over that case. *Id.* These accusations were made by Higgins in the presence of Goldhaber, the defendant, a police officer, a court clerk, a stenographer, and spectators who were attending the trial. *Id.* After

4

Goldhaber brought these accusations to the attention of Judge Howsare, Higgins denied making them. *Id.* Nevertheless, Higgins admitted to making the accusations after Goldhaber pointed out that others present in the courtroom had heard Higgins' comments, and Judge Howsare proceeded to chastise Higgins for his unprofessional conduct. *Id.* As a result of this incident, as well as other incidents, Higgins harbored a great deal of animosity toward Goldhaber.[2] (*Id.*, p. 7, ¶ 18).

The animosity between Higgins and Goldhaber apparently has a long history. Goldhaber alleges that Higgins had given false information about a police report concerning an arson case. (*Id.*, pp. 7-8, ¶ 19). Higgins allegedly stated in court that a police report had indicated that the fire at issue in the case had been set by human hands, while the police report had not actually stated such a conclusion. *Id.* Judge Howsare allegedly chastised Higgins for this misrepresentation. *Id.*

Hershey is a police officer employed by the Pennsylvania State Police. (*Id.*, p. 1, ¶ 1). During the course of their professional dealings, Higgins told Goldhaber that he and Hershey had a social relationship (i.e., they got together to watch football games, drink beer, and sit in a hot tub). (*Id.*, p. 8, ¶ 21). They harbored a great deal of animosity toward Goldhaber. (*Id.*, p. 9, ¶ 22). Goldhaber alleges that Higgins and Hershey conspired to remove him from the court system in retaliation for his representation of criminal defendants in Bedford County. (*Id.*, ¶ 23). Goldhaber further alleges that Higgins wanted to discredit him because of the information that he had about Higgins' dealings outside of the workplace, and that Higgins feared that Goldhaber would someday reveal information about those

---

[2]Goldhaber also alleges that Higgins was under investigation by the Pennsylvania State Police for allegedly having sexual relations with an intoxicated woman inside of a police car. (Document No. 20, p. 8, ¶ 20). It is not clear to the Court whether Goldhaber is alleging that he was aware of this investigation, or whether this investigation was an additional motivating factor for Higgins' alleged hostility toward Goldhaber.

dealings. (*Id.*, ¶ 24).

Goldhaber was arrested on April 9, 2004, and charged with the offense of driving under the influence of alcohol. (*Id.*, p. 4, ¶ 6). Because the District Attorney's Office had a conflict of interest, the prosecution was taken over by the Pennsylvania Office of Attorney General. (*Id.*, p. 9, ¶ 25). At a preliminary hearing on July 19, 2004, the charges against Goldhaber were bound over to the Court of Common Pleas of Bedford County. (*Id.*, ¶ 26). Judge Howsare recused himself from any further proceedings involving Goldhaber's case, and Judge Kevin A. Hess, a member of the Court of Common Pleas of Cumberland County, was appointed to preside over the case. (*Id.*, p. 10, ¶ 27). On January 25, 2005, Judge Howsare entered an order terminating Judge Hess' involvement with the case and appointing Judge George, a member of the Court of Common Pleas of Adams County, to preside. (*Id.*, ¶ 28). No explanation was given for this order. *Id.*

Prior to the trial, Higgins sought to testify on behalf of the Commonwealth. (*Id.*, ¶ 29). His testimony was excluded because it was "questionable and suspect." *Id.* On March 2, 2005, after a jury trial, Goldhaber was found guilty of the offense of driving under the influence of alcohol. (*Id.*, p. 10, ¶ 30). Judge George scheduled Goldhaber's sentencing for April 22, 2005. *Id.* On that date, Judge George sentenced Goldhaber to a term of incarceration of no less than ninety (90) days nor more than one (1) day less than five (5) years at the Bedford County Correctional Institution. (*Id.*, pp. 10-11, ¶ 31). Work release was permitted. *Id.* Goldhaber alleges that, after the imposition of this sentence, Higgins "misappropriated the resources of Bedford Borough, Bedford County, and the Commonwealth of Pennsylvania to stalk and harass" him. (*Id.*, p. 11, ¶ 32). On August 5, 2005, Judge George entered an order revoking Goldhaber's bail because his attorney failed to file an appeal. (*Id.*, ¶ 33).

6

Goldhaber did not learn of Judge George's order until the late afternoon of August 8, 2005. (*Id.*, ¶ 34). The order required him to surrender himself to the Bedford County Jail no later than 6:00 P.M. on August 9, 2005. *Id.* Although Higgins was not supposed to be involved with the case because of a conflict of interest, he obtained a copy of Judge George's order and tried to personally file it in the Office of the Clerk of Courts for Bedford County. (*Id.*, pp. 11-12, ¶ 35). Higgins allegedly directed police officers to hunt down Goldhaber on August 8, 2005, even though Goldhaber did not have to report to jail until the next day. *Id.* Higgins also contacted a reporter for the *Bedford Gazette* in order to ensure that somebody from the newspaper was prepared to photograph Goldhaber when he surrendered himself. *Id.* On August 9, 2005, Goldhaber's conviction was appealed to the Superior Court of Pennsylvania. (*Id.*, p. 12, ¶ 36).

When Goldhaber reported to the Bedford County Jail, he was immediately transported to the Clinton County Correctional Facility, where he was housed in a maximum security federal block. (*Id.*, ¶ 37). Clark was the warden of the Bedford County Jail, and Bowser was the chief probation officer for Bedford County. (*Id.*, p. 1, ¶ 1). By the time Goldhaber had reported to the Bedford County Jail, a decision had been made by Higgins, Clark, Bowser and the Bedford County Prison Board to detain him outside of Bedford County. (*Id.*, p. 12, ¶ 38). Goldhaber alleges that there was "no rational basis" for housing him outside of Bedford County. *Id.* Clark made statements to the media indicating that Goldhaber was moved out of the Bedford County Jail because it was thought that his presence there would cause an uproar among the inmates. (*Id.*, ¶ 39).

After Goldhaber surrendered himself, his attorney filed a petition seeking the reinstatement of bail, the reinstatement of Goldhaber's appellate rights, and the return of Goldhaber to the Bedford

County Jail. (*Id.*, p. 13, ¶ 40). On August 11, 2005, Judge George entered an order stating that the Court of Common Pleas lacked jurisdiction to extend the time period for Goldhaber to seek appellate review of his conviction, that the Court of Common Pleas lacked the authority to direct a warden of a county prison to house Goldhaber at a specific facility, and that Clark's correspondence to the Court of Common Pleas regarding the reasons for Goldhaber's confinement elsewhere reflected "rational security concerns." (*Id.*, pp. 13-14, ¶¶ 41-44). Goldhaber's request for work release was granted subject to "the rules and regulations of the facility in which he [was] incarcerated." (*Id.*, p. 13, ¶ 43).

Subsequent to this order, Clark agreed to have Goldhaber, who was then being held at the Clinton County Jail, returned to the Bedford County Jail, provided that Goldhaber agreed to sign a waiver to protect the Bedford County Jail from liability in the event that he sustained an injury. (*Id.*, p. 14, ¶ 45). Once Clark became aware of the fact that Goldhaber had agreed to this arrangement, and that Goldhaber was eligible to participate in the work release program, he refused to let Goldhaber be housed in the Bedford County Jail. (*Id.*, ¶ 45).

During the 105 days of his incarceration, Goldhaber was housed at four different correctional facilities. (*Id.*, p. 14, ¶ 46). Any reasonable possibility of Goldhaber participating in the work release program was eliminated by his incarceration at the Clinton County Correctional Facility, which is located 125 miles away from his law office. *Id.* Higgins and Clark were both members of the Bedford County Prison Board. (*Id.*, ¶ 47). The Board was fully aware of Clark's actions. *Id.* Goldhaber alleges that the Board intentionally deprived him of his federal and state constitutional rights by permitting him to be housed in Adams County, at Bedford County's expense, and by deviating from a customary policy of allowing individuals in Goldhaber's position to be released to probation after completing the

8

minimum sentence. (*Id.*, p. 15, ¶ 48).

Bedford County Commissioner Steven Howsare, who was the chairman of the Board, told Goldhaber's wife that he knew nothing about how to run a jail, and that decisions related to the Bedford County Jail were generally made by Clark. (*Id.*, ¶ 49). With the assistance of Goldhaber's attorney, Goldhaber's wife contacted the Cambria County Prison, which agreed to house Goldhaber. (*Id.*, ¶ 50). The Cambria County Prison was in close proximity to Goldhaber's office. *Id.* Judge George, Clark, Bowser and the Board were all aware of Goldhaber's reason for wanting to move to the Cambria County Prison. (*Id.*, ¶ 51). Goldhaber prepaid Cambria County for the costs associated with housing him, thereby making it unnecessary for Bedford County to bear those costs. (*Id.*, p. 16, ¶ 52). On September 1, 2005, Goldhaber was transported from Clinton County to the Cambria County Jail at his own expense. (*Id.*, ¶ 53). Clark expressly agreed to this transfer, and he accepted money from Goldhaber's wife to finance it. *Id.* Goldhaber did not try to hide his reasons from any of the Defendants for wanting to be moved. (*Id.*, ¶ 54). On or around September 9, 2005, Goldhaber had obtained an order from Judge Gerard Long, the President Judge of the Court of Common Pleas of Cambria County, permitting him to participate in Cambria County's work release program and to serve his sentence under house arrest. (Document No. 1, pp. 5-8).

Goldhaber alleges that after he was moved to the Cambria County Jail, Higgins had him moved to the Bedford County Jail. (Document No. 24, pp. 16-17, ¶ 55). This allegedly occurred as a result of a conspiracy between Higgins, Judge George, Bowser, Clark and the Board. *Id.* Goldhaber was removed from the Cambria County Prison, and taken to the Bedford County Jail, on September 13, 2005. *Id.* While he was at the Bedford County Jail, Goldhaber was often left alone with several other

9

inmates for extended periods of time. *Id.* He apparently views this as being inconsistent with Clark's earlier indications that his housing in the Bedford County Jail would cause an uproar among the other inmates. *Id.*

While Goldhaber was at the Bedford County Jail, he spoke directly with Clark. (*Id.*, p. 17, ¶ 56). Clark allegedly informed Goldhaber that he would be kept in solitary confinement for an indefinite period of time. *Id.* When Goldhaber asked why he had been moved to and from several different facilities, Clark responded by saying that he did not agree to let Goldhaber participate in the work release program. *Id.* Clark further stated that any complaints by Goldhaber about the situation would result in him being shipped to a state correctional facility. *Id.*

Goldhaber alleges that Judge George was in contact with Higgins, Clark and Bowser. (*Id.*, ¶ 57). These four individuals allegedly conspired to ensure that Goldhaber was unable to participate in the work release program. *Id.* Goldhaber apparently believes that he was moved from the Cambria County Jail to the Bedford County Jail precisely because Judge George, Higgins, Clark and Bowser wanted to preclude his participation in the work release that would have been available to him had he remained in Cambria County. *Id.* Higgins allegedly gave statements to the media indicating that he had been in contact with Judge George, and that Judge George was responsible for moving Goldhaber from prison to prison. (*Id.*, ¶ 58).

Goldhaber was later moved from the Bedford County Jail to the Adams County Adult Correctional Complex in Gettysburg, Pennsylvania. (*Id.*, pp. 17-18, ¶ 59). Judge George served as a member of the Adams County Prison Board, and his service in that capacity began before his service on the bench. *Id.* Judge George has had previous dealings with Clark, since Clark once worked as an

10

officer at the Adams County Adult Correctional Complex. *Id.* Judge George moved Goldhaber without conducting any hearings or issuing additional orders. (*Id.*, p. 18, ¶ 60). Goldhaber alleges that this was done in retaliation for his motion before the Court of Common Pleas of Cambria County. *Id.* Although he had a conflict of interest, Higgins participated in the decision to move Goldhaber. (*Id.*, ¶ 61). The Bedford County Prison Board supported the decision to move Goldhaber from place to place, which is evidenced by the fact that Bedford County was responsible for the costs of Goldhaber's incarceration. (*Id.*, ¶ 62). Goldhaber alleges that Judge George intended to have him housed in Adams County because the distance between the Adams County Adult Correctional Complex and Bedford County was too far to give Goldhaber a meaningful opportunity to participate in the work release program. (*Id.*, pp. 18-19, ¶¶ 63-65).

Higgins and Clark allegedly gave statements to the media about how Judge George had been complicit in their efforts to move Goldhaber from prison to prison. (*Id.*, p. 19, ¶ 68). They described how Judge George had directed the form and substance of Goldhaber's sentence. (*Id.*, ¶ 69). All of the communications between Judge George, Higgins, Clark, Bowser and the Bedford County Prison Board concerning Goldhaber were conducted on an ex parte basis and in the absence of hearings or orders. (*Id.*, pp. 19-20, ¶ 70).

Goldhaber alleges that he remained incarcerated for 15 days beyond his minimum sentence in retaliation for the motion that he filed in the Court of Common Pleas of Cambria County. (*Id.*, p. 20, ¶ 71). He alleges that Bowser told his wife that it was questionable whether Judge George would let him out of jail at the end of the minimum sentence of 90 days because of the "trick" that he had pulled in Cambria County. (*Id.*, p. 22, ¶ 80). On November 4, 2005, Bowser arrived at the Adams County

11

Adult Correctional Complex to have Goldhaber sign release papers. (*Id.*, ¶ 82). Bowser indicated that he would immediately have the papers faxed to Judge George for the purpose of ensuring that Goldhaber would be released at the end of the 90-day minimum sentence. *Id.* Goldhaber alleges that Bowser purposefully delayed the processing of this paperwork in order to extend his incarceration, and that Bowser never explained why Judge George's permission was necessary in order for Goldhaber to be released. *Id.*

While incarcerated at the Adams County Adult Correctional Complex, Goldhaber was placed in solitary confinement by Wypijewski, who was the deputy warden. (*Id.*, p. 20, ¶ 72). Even though Goldhaber had not violated any prison rules, Higgins and Clark allegedly instructed the Adams County Adult Correctional Complex to keep him in solitary confinement, thereby allowing him out of his cell only for one fifteen-minute phone call and one fifteen-minute shower each day. (*Id.*, ¶ 73). Goldhaber was forced to sign a liability waiver in order to escape from solitary confinement. (*Id.*, ¶ 74). While under Wypijewski's supervision, Goldhaber was prohibited from meeting with his attorney. (*Id.*, pp. 20-21, ¶ 75). Although Goldhaber's attorney was sent to a conference room to meet with Goldhaber, she was later told that she could not meet with him, and that she had to leave. *Id.*

During his incarceration in Adams County, Goldhaber submitted multiple inmate request slips seeking redress for improper actions by Adams County Adult Correctional Complex personnel. (*Id.*, p. 21, ¶ 76). After requesting an inmate grievance form, he was told that grievances had to be dealt with informally. *Id.* His complaints were not addressed. On one occasion, a birthday card from Goldhaber's 3-year-old daughter was confiscated on the ground that it was a security threat. *Id.*

Goldhaber claims that, in Bedford County, it is a standard custom for persons incarcerated for

12

driving under the influence (i.e., "DUI offenses") to participate in the work release program while incarcerated and to be released after the expiration of the minimum sentence. (*Id.*, p. 23, ¶¶ 83-84). Having been the stenographer for the President Judge of the Court of Common Pleas of Bedford County, Goldhaber's wife was familiar with the process for obtaining transcripts. (*Id.*, ¶ 86). When Goldhaber hired a new attorney, his wife requested transcripts related to his case from the Bedford County Court Administrator, asking that they be sent to Goldhaber's new attorney. *Id.* After learning of this request, Judge George allegedly sent a threatening letter to Goldhaber's wife. *Id.*

In May 2006, Benton, a member of the Pennsylvania State Police, allegedly began an investigation of Goldhaber for the purpose of finding him in violation of the terms and conditions of his probation. (*Id.*, p. 24, ¶ 88). This investigation allegedly began at the behest of Higgins. *Id.* Goldhaber alleges that Benton, Higgins and Bowser are attempting to initiate bogus criminal proceedings against him on the basis of improper conduct by one of his former employees. (*Id.*, pp. 24-25, ¶ 90). Benton allegedly told Carol Rose, an attorney, that he intends to charge Goldhaber with some kind of wrongdoing because Goldhaber refuses to speak with him. *Id.* Goldhaber alleges that he has never refused to talk to Benton, and that Benton knows that Goldhaber has no legal obligation to engage in such conversation in any event. (*Id.*, p. 25, ¶ 91). Benton allegedly knows that the act of charging Goldhaber with a crime would result in the revocation of his probation, thereby facilitating his return to prison. (*Id.*, ¶ 92). Benton has allegedly indicated that he will file charges against Goldhaber, and that Higgins would then proceed to hold a public press conference at which the general public would be invited to share information about Goldhaber. (*Id.*, ¶ 93).

Goldhaber contends that this pattern of activity by the Defendants violated his rights under the

13

First, Fourth, Eighth and Fourteenth Amendments of the United States Constitution. (*Id.*, pp. 24-28,

¶¶ 95-101). He brings this action against the Defendants under 42 U.S.C. § 1983. (*Id.*, p. 27, ¶ 100).

Although he is not specific as to what sort of theory or theories he relies upon, Goldhaber also appears

to allege that the Defendants engaged in tortious conduct that is actionable under Pennsylvania law.

(*Id.*, ¶ 100).

## A. Judge George's Judicial Immunity

Judge George has moved for dismissal of Mr. Goldhaber's claims against him on the ground of

absolute judicial immunity. (Document No. 25). The Court's analysis begins with the language of 42

U.S.C. § 1983, which provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage,
> of any State or Territory or the District of Columbia, subjects, or causes to be subjected,
> any citizen of the United States or other person within the jurisdiction thereof to the
> deprivation of any rights, privileges, or immunities secured by the Constitution and
> laws, shall be liable to the party injured in an action at law, suit in equity, or other
> proper proceeding for redress, except that in any action brought against a judicial officer
> for an act or omission taken in such officer's judicial capacity, injunctive relief shall not
> be granted unless a declaratory decree was violated or declaratory relief was
> unavailable. For purposes of this section, any Act of Congress applicable exclusively
> to the District of Columbia shall be considered to be a statute of the District of
> Columbia.

42 U.S.C. § 1983. The statute itself affords no personal immunities. The United States Supreme Court

assumes, however, that Congress would have expressly abolished common law immunities within the

language of § 1983 if it had intended to do so. *Pierson v. Ray*, 386 U.S. 547, 554-555, 87 S.Ct. 1213,

1218, 18 L.Ed.2d 288, 295 (1967). For this reason, the judicial immunity that was available at common

law is available to judicial defendants sued under § 1983. At common law, it was "a general principle

14

of the highest importance to the proper administration of justice that a judicial officer, in exercising the authority vested in him, [had to] be free to act upon his own convictions, without apprehension of personal consequences to himself." *Bradley v. Fisher*, 80 U.S. 335, 347, 20 L.Ed. 646, 649 (1872). The question before the Court is whether Judge George is entitled to this form of immunity under the circumstances of this case.

Judicial immunity is immunity from suit itself, not merely immunity from the ultimate assessment of damages. *Mireles v. Waco*, 502 U.S. 9, 11, 112 S.Ct. 286, 288, 116 L.Ed.2d 9, 14 (1991)(citing *Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S.Ct. 2806, 2815, 86 L.Ed.2d 411 (1985)). In general, determination of immunity must be made with reference to the *functions* that the immunity serves rather than to the *person* claiming an entitlement to immunity. *Forrester v. White*, 484 U.S. 219, 227, 108 S.Ct. 538, 544, 98 L.Ed.2d 555, 565 (1988)(first emphasis in original). This functional approach ensures that an official's absolute immunity extends only to those acts performed as a part of his or her official duties. *Clinton v. Jones*, 520 U.S. 681, 693-695, 117 S.Ct. 1636, 1644, 137 L.Ed.2d 945, 960-961 (1997). Hence, judicial immunity extends only to a judge's judicial acts and does not encompass purely administrative actions, even if they "may be essential to the very function of the courts." *Forrester*, 484 U.S. at 227-230, 108 S.Ct. at 544-546, 98 L.Ed.2d at 565-567. Selecting a jury pool; promulgating an attorney code of conduct; enforcing such a code; and hiring and firing persons under the judge's supervision have all been held to be administrative acts and hence without judicial immunity. *Id.* at 228-29.

The leading Supreme Court precedent regarding the application of absolute judicial immunity within the context of a § 1983 action is *Stump v. Sparkman*, 435 U.S. 349, 98 S.Ct. 1099, 55 L.Ed.2d

15

331 (1978). In *Stump*, the Court explained that "[a] judge is absolutely immune from liability for his judicial acts even if his exercise of authority is flawed by the commission of grave procedural errors." *Stump*, 435 U.S. at 359, 98 S.Ct. at 1106, 55 L.Ed.2d at 341. Judicial immunity cannot be overcome by allegations of bad faith or malice. *Mireles*, 502 U.S. at 11, 112 S.Ct. at 288, 116 L.Ed.2d at 14 (citation omitted). Indeed, judicial immunity can be overcome in "only two sets of circumstances." *Id.* (citations omitted). First, a judge is not immune from suit for his or her nonjudicial acts. *Id.* "Second, a judge is not immune for actions, though judicial in nature, taken in the complete absence of *all* jurisdiction." *Mireles*, 502 U.S. at 12, 112 S.Ct. at 288, 116 L.Ed.2d at 14 (citations omitted)(emphasis added).

In determining whether the actions allegedly taken by Judge George were judicial acts, the Court must consider two factors. It must consider the nature of the acts themselves – whether they are functions "normally performed by judges." *Stump*, 435 U.S. at 362, 98 S.Ct. at 1107, 55 L.Ed.2d at 342. In addition, the Court must consider the acts in relation to the expectations of the parties to the case before the judge – whether the parties "dealt with the judge in his [or her] judicial capacity." *Id.* For purposes of this inquiry, whether the actions taken by Judge George were performed in accordance with typical legal formalities is not dispositive. *Stump*, 435 U.S. at 359-363, 98 S.Ct. at 1106-1108, 55 L.Ed.2d at 341-343 (holding that a judge had engaged in judicial acts when he granted a petition for sterilization of a minor child where the case had no docket number; was not filed with the clerk's office; the proceeding was ex parte and without notice to the minor child; there was no hearing; and no guardian *ad litem* had been appointed). Moreover, while the presence or lack of formal proceedings may inform the inquiry as to the expectations of the parties, a judicial act may not be deemed

16

nonjudicial merely because it is done in an informal setting. *Forrester*, 484 U.S. at 227, 108 S.Ct. at 544, 98 L.Ed.2d at 565 (explaining that "the informal and *ex parte* nature of a proceeding has not been thought to imply that an act otherwise within a judge's lawful jurisdiction was deprived of its judicial character"). On the other hand, an act is not necessarily a judicial act merely because it occurs in a judge's chambers. *Archie v. Lanier*, 95 F.3d 438, 441 (6th Cir. 1996)(explaining that the act of committing a sexual assault does not constitute a judicial act under any set of circumstances).

A judge's jurisdiction must be viewed broadly for purposes of judicial immunity analysis. If the actions allegedly taken by Judge George were judicial acts, his absolute immunity cannot be overcome merely upon a showing that he lacked jurisdiction to take those actions. Instead, Mr. Goldhaber must demonstrate that Judge George acted "in the complete absence of *all* jurisdiction." *Mireles*, 502 U.S. at 12, 116 L.Ed.2d at 14 (emphasis added). This legal principle can be traced back to the language in *Bradley v. Fisher*, 80 U.S. 335, 20 L.Ed. 646 (1872), in which the Supreme Court explained:

> A distinction must be here observed between excess of jurisdiction and the clear absence of all jurisdiction over the subject-matter. Where there is clearly no jurisdiction over the subject-matter any authority exercised is usurped authority, and for the exercise of such authority, when the want of jurisdiction is known to the judge, no excuse is permissible. But where jurisdiction over the subject-matter is invested by law in the judge, or in the court which he holds, the manner and extent in which the jurisdiction shall be exercised are generally as much questions for his determination as any other questions involved in the case, although upon the correctness of his determination in these particulars the validity of his judgments may depend.

*Bradley*, 80 U.S. at 351-352, 20 L.Ed. at 651. Thus, a probate judge who tried parties "for public offenses" would be without immunity for such "exercise of . . . usurped authority," while a judge of a

criminal court, even if he tried parties for non-existent crimes and imposed sentences above the statutory maximum, would retain immunity though his actions exceeded his actual jurisdiction. *See id.* at 352. Accordingly, it is clear that a judicial act may be afforded immunity even if taken in the absence of actual adjudicatory jurisdiction. *Gallas v. Supreme Court of Pennsylvania*, 211 F.3d 760, 771 (3d Cir. 2000)(explaining that "a judge does not act in the clear absence of all jurisdiction when the judge enters an order at least colorably within the jurisdiction of her court even though a court rule or other procedural constraint required another judge to act in the matter").

Plaintiff's pleadings do not afford this Court sufficient information to allow it to resolve the issue of Judge George's judicial immunity. Plaintiff alleges George's "collusion and conspiracy" with other defendants to remove Plaintiff from Cambria County Prison to Bedford County Jail, Document 24 ¶55, and then to Adams County Prison, *Id.* ¶ 63, and that "Defendant George moved the plaintiff." *Id.* ¶ 60. Mr. Goldhaber does not, however, explain how Judge George accomplished these transfers, and that information is essential to the instant inquiry.

If Judge George, *acting as a judge*, somehow caused Plaintiff's transfers among the four facilities in which he was incarcerated, judicial immunity likely obtains. "Where a court has *some* subject matter jurisdiction, there is sufficient jurisdiction for immunity purposes." *Figueroa v. Blackburn*, 208 F.3d 435, 443-44 (3d Cir. 2000)(quoting *Barnes v. Winchell*, 105 F.3d 1111, 1112 (6th Cir. 1997))(emphasis added); *see also Gallas v. Supreme Court of Pennsylvania*, 211 F.3d 760, 770 (3d Cir. 2000)(holding that defeat of a claim of judicial immunity for lack of jurisdiction requires "the clear absence of *all* jurisdiction.")(emphasis added). Although the Courts in Pennsylvania "have no authority to order the transfer of prisoners," *Black v. Superintendent, State Corr. Inst. Graterford*, 439 A.2d 193,

18

195 (Pa. Super. Ct. 1981)(citations omitted), and although Judge George was well aware of that fact, citing *Black* in his order of August 11, 2005 denying Mr. Goldhaber's "Motion to Return the Defendant [Goldhaber] to the Bedford County Prison," Document Nos. 12, p. 13; 28, p. 14; 32,

p. 18, the transfer of prisoners is nonetheless within the subject matter jurisdiction of the Courts of Common Pleas. *Black*, 439 A.2d at 445 (holding that the Court of Common Pleas for the county in which a prisoner is held must give its consent to any transfer of the prisoner). Judge George heard Goldhaber's case in Bedford County. Document 24 ¶¶ 26, 28, 30-31. Two of the three transfers of which Goldhaber complains were from Bedford County. *Id.* ¶¶ 37, 59. The subject matter of Goldhaber's transfers was, at least broadly, before the judge.

If the judge merely reviewed Mr. Goldhaber's transfers from the Bedford County facility his actions would have been within his proper jurisdiction. They would also have been judicial in nature, as transfers proposed by prison administrators must be reviewed by the Court for abuse of discretion. *See Black*, 439 A.2d at 445. Such a review is certainly one "normally performed by a judge," and one where the parties, in this case the prison administrators, would have "dealt with the judge in his judicial capacity." *Gallas*, 211 F.3d at 768-69 (quoting *Stump*, 435 U.S. at 362, 98 S.Ct. at 1107). If the judge, as judge, actually ordered transfers, he would have exceeded his jurisdiction, but nonetheless remained within the broad subject matter of prisoner transfers affecting Mr. Goldhaber. The issuance of orders is of course a singularly judicial action.

In light of the above, if Judge George was acting in his capacity as judge, it is immaterial whether he erred, even if he ordered transfers that were in excess of his judicial authority. *Figueroa*, 208 F.3d at 445. Once the twin prongs of judicial action and minimal subject matter jurisdiction have

19

been satisfied, absolute judicial immunity will not be disturbed. *Id.*

Plaintiff's various allegations of improper motives notwithstanding, Judge George's reasons for any actions he may have taken are irrelevant to the determination of judicial immunity. Indeed, "judicial immunity is not overcome by allegations of bad faith or malice, the existence of which ordinarily cannot be resolved without engaging in discovery and eventual trial." *Mireles*, 502 U.S. at 11, 116 L.Ed.2d at 14. Judicial immunity protects judges from more than just liability for mistakes; it protects them from liability for willful wrongs as well. As the Supreme Court noted in *Dennis v. Sparks*, 449 U.S. 24, 101 S.Ct. 183, 66 L.Ed.2d 185 (1980), "[j]udicial immunity arose because it was in the public interest to have judges who were at liberty to exercise their independent judgment about the merits of a case without fear of being mulcted for damages should an unsatisfied litigant be able to convince another tribunal that the judge acted not only *mistakenly* but with *malice* and *corruption.*" *Dennis*, 499 U.S. at 31, 101 S.Ct. at 188, 66 L.Ed.2d at 191-192 (emphasis added). Plaintiff's imputations of improper motives to Judge George's unnamed acts simply have no place in the present analysis.

However, the question of whether Judge George's alleged actions were judicial in nature remains unresolved. Mr. Goldhaber claims that Judge George served on the Adams County Prison Board. (Document No. 24, pp. 17-18, ¶ 59). The judge's service on the Prison Board raises questions about the capacity in which he allegedly acted in this case. There is "an intelligible distinction between judicial acts and the administrative, legislative, or executive functions that judges may on occasion be assigned by law to perform." *Forrester*, 484 U.S. at 227, 108 S.Ct. at 544, 98 L.Ed.2d at 565. Whether an act is judicial is determined by the character of the act itself rather than by the character of the person performing that act. *Ex parte Virginia*, 100 U.S. 339, 348, 25 L.Ed. 676, 680 (1880). Actions taken

by Judge George in his capacity as a member of the Adams County Prison Board are not *judicial* acts. *Padgett v. Stein*, 406 F.Supp. 287, 305 (M.D.Pa. 1975)("In the performance of their duties on the prison board, the county judges are not acting within the scope of their *judicial* jurisdiction. They are not involved in a judicial function and they are not exercising judicial power.")(emphasis in original). This is so even if the actions taken by the judge as a member of the Prison Board are "essential to the very functioning of the courts." *Forrester*, 484 U.S. at 228, 108 S.Ct. at 544, 98 L.Ed.2d at 565.

Mr. Goldhaber is not specific regarding Judge George's alleged acts. Although Mr. Goldhaber claims that Judge George was involved in an illegal conspiracy, he does not explain precisely the judge's role.(Document No. 24, pp. 19-20, ¶¶ 65-71). Mr. Goldhaber argues that Judge George's actions were administrative rather than judicial. (*Id.*, p. 19, ¶ 67). While the factual assertions in the Amended Complaint are assumed to be true for purposes of Judge George's Motion to Dismiss, Mr. Goldhaber's allegation that Judge George was acting in an administrative capacity is a legal conclusion, and the Court is not required to credit it. *Morse v. Lower Merion School District*, 132 F.3d 902, 906 (3d Cir. 1997)("[A] court need not credit a complaint's 'bald assertions' or 'legal conclusions' when deciding a motion to dismiss."). Thus, Mr. Goldhaber's characterization of Judge George's alleged conduct is not dispositive.

Judge George insists that he was acting in his judicial capacity. (Document No. 27, p. 6). He relies on *Figueroa v. Blackburn*, 208 F.3d 435, 443 (3d Cir. 2000), in which the Court explained that the act of ordering one to prison is a "paradigm judicial act," and that such an act does not become "nonjudicial" merely because it is wrong. However, this "paradigm judicial act" only afforded the judge in that case judicial immunity because Mr. Figueroa was before the judge and "dealing" with the judge

21

"*in her judicial capacity.*" *Id.*(emphasis added). If Judge George was in fact acting as a member of the Adams County Prison Board, for example, he was not acting judicially, and judicial immunity would not attach to his actions.

There is another possible scenario to consider. Judge George's order of August 11, 2005, expressly *granted* Mr. Goldhaber's request for work release, subject to "the rules and regulations of the facility in which he [was] incarcerated." (Document No. 28, p. 14). Mr. Goldhaber does not allege that Judge George amended this order, or that this order was somehow superseded by a later judicial action. Instead, he alleges that Judge George conspired with the other Defendants for the purpose of ensuring that "the rules and regulations" referenced in the order did not allow Mr. Goldhaber to do precisely what the order, *which remained in effect*, allowed him to do. (Document No. 24, p. 22, ¶ 79). Notably, the allegations against Judge George concerning retaliation for Goldhaber's application for work release in the Court of Common Pleas of Cambria County implicate the order of *another* judge. (Document 1, p.8 ¶ 9; Document 24, pp. 16-17, ¶ 55). It is far from clear that a judge who conspires to subvert a ruling made by another judge, without issuing an order of his own, engages in a *judicial* act. As suggested above, Judge George's reliance on *Figueroa* is misplaced.

In *Stump*, the Supreme Court made it clear that the informal nature of an act, without more, does not suffice to make that act non-judicial. *Stump*, 435 U.S. at 360-363, 98 S.Ct. at 1106-1108, 55 L.Ed.2d at 341-343. Nonetheless, in that case, the judge had approved a specific petition, albeit in an extremely informal way. *Stump*, 435 U.S. at 351, 98 S.Ct. at 1102, 55 L.Ed.2d at 336, n. 1. Goldhaber does not allege that Judge George approved any order modifying the terms of his sentence or granted any sort of petition and the Court does not understand Judge George to argue otherwise.

22

Judge George's participation in this alleged conspiracy certainly would not have constituted a judicial act if he had not presided over Mr. Goldhaber's criminal trial, but merely having presided over a person's trial does not automatically render all the judge's actions affecting that person judicial. An act that is administrative or otherwise non-judicial does not become judicial merely because the person performing that act happens to be the judge assigned to a particular individual's case. Put another way, although *jurisdiction* is to be viewed broadly within the context of a judicial immunity analysis, it does not follow that an act is inherently judicial merely because it involves the interaction between a judge and someone over whom the judge possesses jurisdiction. Judicial immunity, like other forms of official immunity, is grounded in the nature of the function performed rather than in the identity of the individual who performed that function. *Clinton*, 520 U.S. at 694-695, 117 S.Ct. at 1644, 137 L.Ed.2d at 960-961.

By way of illustration, consider a case where a judge presides at a murder trial and upon the defendant's conviction sentences him to death. Even though the judge's actions up to that point are undisputably judicial, and even though the defendant is clearly within the judge's jurisdiction, if the judge then shoots and kills the defendant himself the judge's act would be an undisputably non-judicial action from whose consequences the judge would certainly not be immune. Regarding the instant motion, while a conspiracy to corruptly *amend* the prior sentencing order would clearly fall within the scope of judicial immunity, it is not clear that a conspiracy to *subvert* that order (while leaving it in effect) would do so as well.

As the Supreme Court observed in *Forrester*, "[d]ifficulties have arisen primarily in attempting to draw the line between truly judicial acts, for which immunity is appropriate, and acts that simply

23

happen to have been done by judges." *Forrester*, 484 U.S. at 227, 108 S.Ct. at 544, 98 L.Ed.2d at 565. That line is particularly hard to draw in this case, since Judge George apparently served as both the judge who sentenced Mr. Goldhaber and as a member of the board for one of the prisons in which Mr. Goldhaber was confined. The problem with making a precise determination in this case is that Mr. Goldhaber simply alleges, in general terms, that Judge George "moved" him, without issuing a new order, "because [Goldhaber] made lawful motions before the Cambria County courts, and because he defended himself in court." (Document No. 24, p. 18, ¶ 60). Exactly what Mr. Goldhaber means by the word "moved" is not clear.

In *Thomas v. Independence Township*, 463 F.3d 285, 299 (3d Cir. 2006), the United States Court of Appeals for the Third Circuit noted that "there is an inherent tension between federal qualified immunity jurisprudence and the concept of notice pleading." In this case, there is a similar tension between absolute immunity and notice pleading. While the judicial immunity determination must be made at the earliest possible stage of the litigation, Goldhaber had no duty to tailor his pleadings to an anticipated absolute immunity defense. *Thomas*, 463 F.3d at 299-300. Although an absolute immunity inquiry does not entail a fact-specific examination of whether the actions taken by the person raising the immunity defense were in violation of clearly established law of which a reasonable person would have known, this case illustrates that the Supreme Court's *functional* approach to absolute immunity requires a degree of particularity as to the *function* performed by a defendant such as Judge George. *Clinton*, 520 U.S. at 694-695, 117 S.Ct. at 1644, 137 L.Ed.2d at 961. Goldhaber's Amended Complaint is simply too vague on this point to allow for a meaningful resolution of the immunity issue. Thus, it cannot be said that his allegations are clearly sufficient to overcome Judge George's absolute immunity.

24

On the other hand, since this matter comes before the Court on a Motion to Dismiss, the Amended Complaint must be construed in the light most favorable to Mr. Goldhaber, and the Court must determine whether he may be entitled to relief under *any reasonable reading* of the Amended Complaint. *Pinker v. Roche Holdings, Ltd.*, 292 F.3d 361, 374, n. 7 (3d Cir. 2002). Since it is not clear what Mr. Goldhaber alleges that Judge George actually did, the Court cannot conduct a meaningful *functional* immunity analysis at this point.

The Court recognizes that Mr. Goldhaber has already amended his allegations in response to the Defendants' original motions to dismiss. (Document No. 24). Nevertheless, he did so prior to the decision of the Court of Appeals in *Thomas*. Moreover, the Amended Complaint "does not lend itself to an early resolution of the [absolute] immunity issue[.]" *Thomas*, 463 F.3d at 301. For this reason, Mr. Goldhaber will be ordered to file a more definite statement, in which he is to spell out the allegations against Judge George with greater precision. *Thomas*, 463 F.3d at 301 ("Even when a defendant has not formally expressed the need for a definite statement, the district court has the discretion to order a more definite statement, in observance of the Supreme Court's mandate to facilitate an early resolution of the qualified immunity issue and in order to avoid a waste of judicial resources."). Discovery in this case has already been stayed. (Document No. 39). If Mr. Goldhaber's specific allegations against Judge George indicate that the judge was acting in his capacity as a member of the Adams County Prison Board or otherwise non-judicially, or if they show action wholly outside of the judge's subject matter jurisdiction over Mr. Goldhaber's case, as may be the case with what Mr. Goldhaber terms the "threatening letter," Mr. Goldhaber may be entitled to some discovery with respect to his allegations against Judge George. *Thomas*, 463 F.3d at 301 ("If the plaintiff's action survives

25

these hurdles, the plaintiff ordinarily will be entitled to some discovery, but the district court may limit the timing, sequence, frequency, and extent of that discovery under Rule 26.").

Resolution of Judge George's Motion to Dismiss must await a more definite statement from Mr. Goldhaber. After Mr. Goldhaber files a more definite statement, Judge George will, of course, have an opportunity to supplement his arguments for the purpose of addressing the specific allegations contained therein. The burden of pleading absolute immunity lies with Judge George. *Thomas*, 463 F.3d at 293-294. This Court cannot determine whether Judge George's alleged actions were judicial in *nature* without knowing the *nature* of the actions themselves. *Mireles*, 502 U.S. at 13, 116 L.Ed.2d at 15 ("Accordingly, as the language in *Stump* indicates, the relevant inquiry is the 'nature' and 'function' of the act, not the 'act itself.'"). For the same reason that the factual allegations against Judge George are not precise enough to enable the Court to determine whether he is entitled to absolute immunity, the Court cannot determine, at this stage, whether he is entitled to qualified immunity, assuming *arguendo* that he is not entitled to absolute immunity. *See Forrester*, 484 U.S. at 230, 108 S.Ct. at 546, 98 L.Ed.2d at 567.

## B. The Claims Against the Board, Higgins, Clark, Bowser and Wypijewski

Goldhaber alleges violations of the First, Fourth, Eighth and Fourteenth Amendments to the United States Constitution. (Document No. 24, pp. 26-27, ¶¶ 96-99). In support of their Motion to Dismiss, the Board, Higgins, Clark, Bowser and Wypijewski brief a total of nine issues. (Document No. 29, pp. 2-3). The Court will address them in the order that it deems appropriate, rather than in the order that the Defendants have briefed them, in order to avoid duplicative analyses and excessive redundancies. At the outset, a few preliminary matters must be addressed.

26

Higgins, Clark, Bowser and Wypiejewski apparently believe that Goldhaber has sued them only in their official capacities. (Document No. 29, pp. 19, 21). This reading of the Amended Complaint makes no sense, since Goldhaber unambiguously states that they are being sued in their individual capacities. (Document No. 24, p. 3, ¶ 4)("Punitive damages are demanded of the seven non-entity defendants, who are being sued in their individual capacities, because their misconduct was particularly egregious."). The Court does not see how the Amended Complaint can be read to state claims against these individuals only in their official capacities. The Defendants apparently misunderstand the difference between official capacity suits and personal capacity suits. (Document No. 29, p. 19)("Plaintiff's Amended Complaint is devoid of any allegations against Defendants, Higgins, Clark, Bowser and Wypijewski in their personal or individual capacity."). Indeed, they fundamentally misunderstand the very precedent upon which they rely.

In *Hafer v. Melo*, 502 U.S. 21, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991), the Supreme Court held that state officials may be sued under 42 U.S.C. § 1983 in their *personal* capacities for constitutional or statutory violations committed during the course of their *official* duties. *Hafer*, 502 U.S. at 27-31, 112 S.Ct. at 362-363, 116 L.Ed.2d at 311-313. The Supreme Court did not hold that suits against such officials for damages inflicted during the course of their official duties are suits against them in their official capacities. When an official sued in his or her official capacity leaves office, his or her role in the litigation is automatically assumed by his or her successor. *Hafer*, 502 U.S. at 25, 112 S.Ct. at 361, 116 L.Ed.2d at 309. The capacity of a suit turns on whether relief is sought against the individual or against the individual's office. It does not turn on whether the injury complained of was inflicted pursuant to the defendant's official duties. 502 U.S. at 27, 112 S.Ct. at 363, 116 L.Ed.2d at 311. Even

27

though the alleged actions of Higgins, Clark, Bowser and Wypijewski were taken pursuant to their official duties, they can be held *personally* liable under § 1983 for violating Goldhaber's rights under federal law. Any belief by the Defendants to the contrary is in error. In order to sue an individual under § 1983, of course, a plaintiff must allege that the individual was *personally* involved in the alleged wrongdoing. *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988). "[A] civil rights complaint is adequate where it states the conduct, time, place, and persons responsible." *Evancho v. Fisher*, 423 F.3d 347, 353 (3d Cir. 2005). Having examined the Amended Complaint in great detail, the Court is convinced that Goldhaber alleges sufficient personal involvement on the part of Higgins, Clark, Bowser and Wypijewski to satisfy this requirement. (Document No. 24, pp. 12, ¶ 39, 16-17, ¶¶ 55-58, 20-21, ¶¶ 72-76). The Defendants' argument with respect to the capacity in which these four individuals have been sued is clearly lacking in merit. Moreover, since the Defendants' argument with respect to the unavailability of punitive damages from Higgins, Clark, Bowser and Wypijewski is based on the mistaken assumption that they have only been sued in their official capacities, that argument is also meritless. (Document No. 29, p. 21).

Clark, Bowser and Wypijewski contend that they are entitled to qualified immunity. (Document No. 29, pp. 19-20). The qualified immunity inquiry, however, cannot be conducted in a vacuum. Before considering the question of whether these three individuals are entitled to qualified immunity, the Court must make a "threshold" determination as to whether the facts alleged in the Amended Complaint, taken in the light most favorable to Goldhaber, allege a violation of the Constitution. *Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151, 2156, 150 L.Ed.2d 272, 281 (2001). If no constitutional right would be violated under the allegations, there is no need for the Court to make

further inquiries concerning qualified immunity. *Saucier*, 533 U.S. at 201, 121 S.Ct. at 2156, 150 L.Ed.2d at 281. Consequently, the Court will begin the inquiry by deciding whether Goldhaber properly alleges violations of the First, Fourth, Eighth and Fourteenth Amendments that are actionable under § 1983.

Section 1983 does not create substantive legal rights. *Maher v. Gagne*, 448 U.S. 122, 129, 100 S.Ct. 2570, 2574, 65 L.Ed.2d 653, 661, n. 11 (1980). For this reason, Goldhaber cannot prevail in a § 1983 action without establishing an underlying violation of federal law. Section 1983 "contains no state-of-mind requirement independent of that necessary to state a violation of the underlying constitutional right." *Daniels v. Williams*, 474 U.S. 327, 330, 106 S.Ct. 662, 664, 88 L.Ed.2d 662, 667 (1986). Therefore, the only state-of-mind requirements applicable to the Amended Complaint are those necessary to properly establish underlying constitutional violations. As in any case brought under § 1983, the Court must begin the analysis by identifying "the exact contours of the underlying right[s] said to have been violated." *County of Sacramento v. Lewis*, 523 U.S. 833, 842, 118 S.Ct. 1708, 1714, 140 L.Ed.2d 1043, 1055, n. 5 (1998).

Goldhaber alleges that the Defendants violated his rights under the First Amendment by retaliating against him for filing a motion before the Court of Common Pleas of Cambria County. (Document No. 24, p. 26, ¶ 96). The First Amendment provides, in pertinent part, that "Congress shall make no law . . . abridging . . . the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. CONST. amend. I. The Due Process Clause of the Fourteenth Amendment provides that "No State shall . . . deprive any person of life, liberty, or property, without due process of law[.]" U.S. CONST. amend. XIV, § 1. The Petition Clause of the First

29

Amendment is applicable to the States because of its incorporation within the Due Process Clause of the Fourteenth Amendment. *Tarpley v. Keistler*, 188 F.3d 788, 794, n. 4 (7th Cir. 1999). Thus, the prohibitions of the Petition Clause were applicable to the Defendants in this case.

Although a prisoner's right of access to the courts rests to some extent on the Due Process and Equal Protection Clauses of the Fourteenth Amendment, the Petition Clause of the First Amendment is implicated in cases in which prisoners allege that they have suffered adverse actions in retaliation for filing lawsuits. *Peterkin v. Jeffes*, 855 F.2d 1021, 1036 (3d Cir. 1988); *Cook v. Boyd*, 881 F.Supp. 171, 176, n. 4 (E.D.Pa. 1995). Indeed, courts have consistently identified the Petition Clause as a source of a prisoner's right to access to the courts. *Patterson v. Mintzes*, 717 F.2d 284, 288-289 (6th Cir. 1983); *Etheridge v. Evers*, 326 F.Supp.2d 818, 825 (E.D.Mich. 2004); *Buhrman v. Wilkinson*, 257 F.Supp.2d 1110, 1120 (S.D.Ohio 2003). "Penalizing a prisoner's exercise of the constitutional right to petition for redress of grievances is a constitutional tort." *Simpson v. Nickel*, 450 F.3d 303, 305 (7th Cir. 2006). Retaliation for the exercise of this constitutional right is actionable under § 1983 even if the retaliatory act itself would not otherwise violate the Constitution. *Thomas v. Hill*, 963 F.Supp. 753, 756 (N.D.Ind. 1997).

An individual's rights under the Petition Clause, of course, extend to matters other than the filing of lawsuits. *California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 510, 92 S.Ct. 609, 612, 30 L.Ed.2d 642, 646 (1972)("The right of access to the courts is indeed but one aspect of the right of petition."); *Foraker v. Chaffinch*, ___F.3d___, 2007 WL 244561, at \*4-5, 2007 U.S. App. LEXIS 20739, at \*12-15 (3d Cir. August 30, 2007)(explaining that petitioning activity can be either formal or informal, consisting of anything from lawsuits to letters). Within the prison setting, however, it is

30

difficult to imagine a more important application of the Petition Clause than in the case of a prisoner seeking access to a judicial tribunal for the purpose of challenging the conditions of his or her confinement. Nevertheless, one's right to petition the government is qualified in certain respects. First of all, while prisoners have the right to file grievances and lawsuits, they may sometimes be held accountable for the specific statements or allegations that they make. *Hale v. Scott*, 252 F.Supp.2d 728, 731-735 (C.D.Ill. 2003); *Curry v. Hall*, 839 F.Supp. 1437, 1440 (D.Or. 1993). Secondly, the Petition Clause does not provide a right to bring lawsuits based on intentional falsehoods or claims known to be frivolous. *McDonald v. Smith*, 472 U.S. 479, 484, 105 S.Ct. 2787, 2791, 86 L.Ed.2d 384, 389 (1985); *Bill Johnson's Restaurants, Inc. v. NLRB*, 461 U.S. 731, 743, 103 S.Ct. 2161, 2170, 76 L.Ed.2d 277, 289 (1983). Suits lacking a reasonable basis constitute sham litigation and are, consequently, outside of the ambit of constitutional protection. *Herr v. Peguea Township*, 274 F.3d 109, 115-117 (3d Cir. 2001); *San Fillippo v. Bongiovanni*, 30 F.3d 424, 437 (3d Cir. 1994).

The Supreme Court has recognized that rights under the Petition Clause, like other First Amendment rights, need "breathing space" in order to have their intended effect. *BE&K Construction Company v. NLRB*, 536 U.S. 516, 530-533, 122 S.Ct. 2390, 2399-2400, 153 L.Ed.2d 499, 514-516 (2002). For this reason, an argument that a lawsuit is not entitled to First Amendment protection can generally be successful only upon a showing that a particular lawsuit lies on an objectively unreasonable basis. *White v. Lee*, 227 F.3d 1214, 1232 (9th Cir. 2000)("Objective baselessness is the sine qua non of any claim that a particular lawsuit is not deserving of First Amendment protection."). It must also be remembered that, even in a court of law, the arguments raised by litigants are themselves entitled to a degree of constitutional protection. *Legal Services Corporation v. Velazquez*, 531 U.S. 533, 547-549,

31

121 S.Ct. 1043, 1051-1053, 149 L.Ed.2d 63, 74-77 (2001). With these general principles in mind, the

Court will now turn to the precise circumstances of the present case.

The Defendants argue that Goldhaber had no right to petition the Court of Common Pleas of

Cambria County for work release or house arrest, since only Judge George had jurisdiction as to such

matters. (Document No. 29, pp. 10-12). They base their argument on 61 P.S. § 2141, which provides:

> Whenever any person has been sentenced to undergo imprisonment in a county jail or
> workhouse, hereafter referred to as a jail, for a term of less than five years the court, at
> the time of sentence or at any time thereafter upon application made therefor, may by
> order direct the sheriff, prison keeper, jail keeper, warden or other administrative head
> of a jail to permit the prisoner to leave the jail during necessary and reasonable hours
> for the purpose of working at his employment, conducting his own business or other
> self-employed occupation, including housekeeping and attending to the needs of family,
> seeking employment, attendance at an educational institution, securing medical
> treatment or such other lawful purposes as the court shall consider necessary and
> appropriate. The order of court may be rescinded or modified at any time with or
> without notice to the prisoner.

61 P.S. § 2141. The Court is not convinced that the statute speaks to the precise issue presented in this

case. The statute vests jurisdiction in the Court of Common Pleas to grant work release to a prisoner

falling within the ambit of its language. It does not explain what county's Court of Common Pleas

would have jurisdiction to entertain an "application" for work release in a situation where, as here, a

prisoner is confined in a county other than the one in which he was sentenced. Moreover, the

Defendants cite to no authority to support their assertion that the Court of Common Pleas of Cambria

County lacked jurisdiction to entertain Goldhaber's application for work release. (Document No. 29,

pp. 10-12).

The Defendants ask the Court to infer that the Court of Common Pleas of Cambria County

lacked jurisdiction to entertain Goldhaber's application from the fact that President Judge Gerard Long, having granted Goldhaber's application for house arrest on September 9, 2005, vacated that order five days later. (*Id.*, p. 11). The Court notes that when Judge Long originally granted Goldhaber's request for house arrest, he was apparently under the impression that Goldhaber's original sentence had permitted house arrest. (Document Nos. 12, p. 18, 28, p. 19). On September 14, 2005, Judge Long vacated the order granting Goldhaber's request for house arrest. (Document Nos. 12, p. 19, 28, p. 20). Nevertheless, when he vacated his prior order, Judge Long expressly granted Goldhaber's request for work release, which was permitted under Judge George's order of August 11, 2005. *Id.* Judge Long apparently believed that he had jurisdiction to entertain Goldhaber's application for work release, and this Court sees no reason to view the matter differently.

In any event, the Court need not decide this question of Pennsylvania law, since it is unnecessary for Goldhaber to establish that jurisdiction in the Court of Common Pleas of Cambria County was proper. The Supreme Court has recognized that unsuccessful lawsuits are entitled to protection under the Petition Clause, and that even objectively baseless litigation may be entitled to some "breathing room" protection. *BE & K Construction Company*, 536 U.S. at 530-533, 122 S.Ct. at 2398-2400, 153 L.Ed.2d at 514-516. The Court need not decide whether such prophylactic protection is afforded to baseless litigation by the Petition Clause, since it is clear that Goldhaber's application for house arrest and/or work release was not objectively baseless. Indeed, it was *granted*. Goldhaber's application was not disingenuous or misleading. It is not clear why Judge Long mistakenly believed that Judge George had permitted Goldhaber to serve his sentence under house arrest. Nevertheless, the application filed by Goldhaber did not include misinformation. Goldhaber made it clear that Judge George's order had

33

afforded him "work release subject to the rules and regulations of the facility where he [was] housed[,]" and that he was requesting release to house arrest to *facilitate* work release. (Document Nos. 12, p. 15, 28, p. 16, ¶¶ 5-6). Goldhaber referred to his application as a "Petition for Furlough to House Arrest To Facilitate Work Release." (Document Nos. 12, p. 15, 28, p. 16). A copy of Judge George's order was attached to the petition as an exhibit. (Document Nos. 12, pp. 15-17, 28, pp. 16-18). Any misunderstanding as to what Judge George had permitted was due to Judge Long's apparent oversight, since it is clear from the record that Goldhaber did not employ a "trick" to obtain house arrest. To the extent that the Defendants believe that house arrest was not necessary to facilitate Goldhaber's work release, it must be remembered that zealous advocacy, which is a hallmark of our adversarial legal system, does not take litigation outside of the ambit of Petition Clause protection. The Defendants' argument that the application filed by Goldhaber in the Court of Common Pleas of Cambria County did not constitute protected activity for purposes of the First Amendment is wholly without merit. This remains true even if it is assumed that the Court of Common Pleas of Cambria County had no jurisdiction to entertain Goldhaber's application (and that Judge Long was wrong in viewing jurisdiction as proper). Constitutional protection extends to genuine grievances, and "the genuineness of a grievance does not turn on whether it succeeds." *BE & K Construction Company*, 536 U.S. at 532, 122 S.Ct. at 2399, 153 L.Ed.2d at 515. It is difficult to fathom on what basis the Defendants believe that Goldhaber's *successful* application was sufficiently baseless to remove it from the sphere of constitutional protection.       While Goldhaber has properly alleged that he engaged in activity protected under the First Amendment, he must do more in order to establish a violation of the Petition Clause. He must show that the Defendants retaliated against him in response to his protected activity,

34

and that there was a causal relationship between his protected activity and the retaliatory actions taken by the Defendants. *Anderson v. Davila*, 125 F.3d 148, 161 (3d Cir. 1997). For purposes of this inquiry, it makes no difference whether the actions allegedly taken by the Defendants were otherwise legal. "An action that would otherwise be permissible is unconstitutional if it is taken in retaliation for the exercise of the right of access to the courts." *Bradley v. Pittsburgh Board of Education*, 910 F.2d 1172, 1177 (3d Cir. 1990). With that in mind, the Court now turns to the alleged retaliatory actions taken against Goldhaber by the Defendants.

Although Goldhaber alleges that the conspiracy against him originated before Judge Long's order of September 9, 2005, the only allegations relevant to his Petition Clause claims are those which postdated that order, since the relevant question is whether the Amended Complaint properly alleges retaliatory conduct on the part of the Defendants. The relevant sequence of events began on September 1, 2005, when Goldhaber was allegedly transferred from Clinton County to the Cambria County Jail. (Document No. 24, p. 16, ¶ 53). Not only were Judge George, Clark, Bowser and the Bedford County Prison Board aware of the transfer, they are alleged to have been complicit in the transfer. (*Id.*, pp. 15-16, ¶¶ 50-54). Indeed, it is alleged that Clark accepted money from Goldhaber's wife to arrange the transfer. (*Id.*, p. 16, ¶ 53). After arriving in Cambria County, Goldhaber filed his application for house arrest in the Court of Common Pleas of Cambria County. (Document Nos. 12, pp. 15-17, 28, pp. 16-18). This application was apparently filed on September 7, 2005. (Document Nos. 12, p. 16, 28, p. 17). Judge Long granted Goldhaber's petition on September 9, 2005. (Document Nos. 12, p. 18, 28, p. 19). Goldhaber alleges that, on September 13, 2005, the Defendants had him removed from the Cambria County Jail and transported to the Bedford County Jail, where Clark had previously indicated that

35

Goldhaber could not be safely housed. (Document No. 24, pp. 16-17, ¶ 55). One day later, on September 14, 2005, Judge Long vacated his prior order, which had granted Goldhaber's request for house arrest, but nevertheless made it clear that Goldhaber was entitled to work release. (Document Nos. 12, p. 19, 28, p. 20).

While Goldhaber was at the Bedford County Jail, Clark allegedly told him that he would be kept in solitary confinement indefinitely, and that he would not be permitted to avail himself of work release. (Document No. 24, p. 17, ¶ 56). Clark further told Goldhaber that if he complained about the arrangement, he would be shipped to a state correctional facility. *Id.* Thereafter, Goldhaber was transferred to the Adams County Adult Correctional Complex in Gettysburg, Pennsylvania. (*Id.*, pp. 17-18, ¶ 59). Judge George was on the Adams County Prison Board, and Clark was a former officer at the Adams County Adult Correctional Complex. *Id.* Wypijewski, the deputy warden, allegedly placed Goldhaber in solitary confinement. (*Id.*, p. 20, ¶ 72). Bowser allegedly told Goldhaber's wife that Judge George might not let Goldhaber out of prison at the expiration of his minimum sentence because of the "trick" that he had pulled in Cambria County. (*Id.*, p. 22, ¶ 80). It is further alleged that Bowser deliberately delayed the processing of the paperwork which would have led to Goldhaber's release at the end of his minimum sentence. (*Id.*, ¶¶ 81-82). A birthday card from Goldhaber's 3-year-old daughter was allegedly confiscated as a security threat. Goldhaber alleges that his removal from the Cambria County Jail, and his subsequent confinement in the Bedford County Jail and the Adams County Adult Correctional Complex, was orchestrated by the Defendants for the purpose of denying him the benefit of Judge Long's orders permitting house arrest and/or work release. (*Id.*, p. 21, ¶ 77).

Since this matter is before the Court on the Defendants' Motions to Dismiss, the allegations

36

contained in the Amended Complaint are assumed to be true. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S.Ct. 2499, 2509, 168 L.Ed.2d 179, 192 (2007). The Amended Complaint must also be read in its entirety, so that all of the allegations are read in their proper context. *Tellabs*, 127 S.Ct. at 2509, 168 L.Ed.2d at 193. Given these standards, it is clear that Goldhaber properly alleges violations of the Petition Clause. It remains to be determined whether Clark, Bowser and Wypijewski are entitled to qualified immunity. (Document No. 28, p. 3, ¶ 10). Higgins is apparently not raising the defense of qualified immunity because of his recusal from Goldhaber's criminal case.

In the context of a qualified immunity analysis, the Court must "examine whether the alleged constitutional or statutory violations were 'clearly established' at the time of the alleged violations." *Blake v. Wright*, 179 F.3d 1003, 1007 (6th Cir. 1999). "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202, 121 S.Ct. at 2156, 150 L.Ed.2d at 282. Since the applicable standard is one of objective reasonableness, the subjective intent of a particular defendant is irrelevant. *Blake*, 179 F.3d at 1008. Officials can be on notice that their conduct "violates established law even in novel factual circumstances." *Hope v. Pelzer*, 536 U.S. 730, 741, 122 S.Ct. 2508, 2516, 153 L.Ed.2d 666, 679 (2002). The Supreme Court has recognized that "general statements of law are not inherently incapable of giving fair and clear warning[.]" *United States v. Lanier*, 520 U.S. 259, 271, 117 S.Ct. 1219, 1227, 137 L.Ed.2d 432, 446 (1997).

In the Amended Complaint, Goldhaber alleges that Clark and Bowser participated in a conspiracy to remove him from the Cambria County Jail after his successful application for house arrest. (Document No. 24, pp. 16-17, ¶ 55). He further alleges that Clark explicitly threatened to send him to

37

a state correctional facility if he complained about not being allowed to avail himself of work release. (*Id.*, p. 17, ¶ 56). Wypijewski allegedly placed Goldhaber in solitary confinement while he was incarcerated at the Adams County Adult Correctional Complex. (*Id.*, p. 20, ¶ 72). It is alleged that these actions were taken against Goldhaber in retaliation for his filing of an application for house arrest and/or work release in the Court of Common Pleas of Cambria County. At the time of these alleged actions, the contours of Goldhaber's rights under the Petition Clause were sufficiently clear to put Clark, Bowser and Wypijewski on notice that their conduct, if engaged in for a retaliatory purpose, would violate the Constitution. This is particularly true because these retaliatory actions were allegedly taken in the prison setting, which is the very context in which most retaliation cases under the Petition Clause have arisen. *Bradley*, 910 F.2d at 1177 ("An action that would otherwise be permissible is unconstitutional if it is taken in retaliation for the exercise of the right of access to the courts. Although most cases concerning retaliation in violation of the right of access to the court have arisen in the prison context, the same principles have been applied in other areas."). Moreover, a reasonable official in the position of Clark, Bowser or Wypijewski would have known that his or her alleged acts of retaliation were sufficiently severe to dissuade a reasonable prisoner from seeking legal redress in court, and that the harms inflicted upon Goldhaber were not merely trivial harms. *Burlington Northern & Sante Fe Railway Co. v. White*, 126 S.Ct. 2405, 2410-2418, 165 L.Ed.2d 345, 354-363 (2006)(adopting a *material adversity* standard for evaluating retaliation claims under Title VII of the Civil Rights Act of 1964). Thus, even if the Court were to assume that Goldhaber must allege retaliatory action severe enough to deter a reasonable prisoner under the circumstances from filing a petition in court, the allegations against Clark, Bowser and Wypijewski are sufficiently severe to preclude a determination

38

that a reasonable official under the circumstances would not have realized that his or her actions violated the Petition Clause. For this reason, Clark, Bowser and Wypijewski are not entitled to qualified immunity with respect to Goldhaber's First Amendment claims at this stage. They remain free to raise the defense of qualified immunity at a later stage in this case if the evidence adduced in discovery does not support Goldhaber's allegations. *Behrens v. Pelletier*, 516 U.S. 299, 309, 116 S.Ct. 834, 840, 133 L.Ed.2d 773, 785-786 (1996).

Goldhaber also alleges that the Defendants violated his rights under the Fourth Amendment. (Document No. 24, p. 26, ¶ 97). The Fourth Amendment provides that "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. CONST. amend. IV. The prohibitions contained within the Fourth Amendment are applicable to the States by virtue of the Due Process Clause of the Fourteenth Amendment. *Cady v. Dombrowski*, 413 U.S. 433, 440, 93 S.Ct. 2523, 2527, 37 L.Ed.2d 706, 714 (1973). Goldhaber devotes only a single sentence in his brief to his Fourth Amendment claims. (Document No. 34, p. 26)("Plaintiff has a 4th Amendment right not to be unlawfully seized out of retaliation for exercising his First Amendment rights and inter alia, not to be taken into custody and moved about in violation of an existing court order for unlawful reasons."). The Defendants argue that since Goldhaber was already in custody at the time of the "seizure" complained of, he could not be "seized" at all for purposes of the Fourth Amendment. (Document No. 29, p. 13). Remarkably, neither party cites a single case addressing this question.

While prisoners do not lose all of their constitutional rights as a consequence of their

39

incarceration, it cannot be doubted that "imprisonment carries with it the circumscription or loss of many significant rights." *Hudson v. Palmer*, 468 U.S. 517, 524, 104 S.Ct. 3194, 3199, 82 L.Ed.2d 393, 401 (1984). Imprisonment does not automatically deprive an inmate of all constitutional rights. *Beard v. Banks*, 126 S.Ct. 2572, 2577, 165 L.Ed.2d 697, 704 (2006). Nevertheless, due to the very nature of incarceration, it is difficult to characterize a search or seizure occurring in the prison context as "unreasonable" within the meaning of the Fourth Amendment. *Hudson*, 468 U.S. at 525-526, 104 S.Ct. at 3200, 82 L.Ed.2d at 402-403. In *Hudson v. Palmer*, 468 U.S. 517, 527-528, 104 S.Ct. 3194, 3201, 82 L.Ed.2d 393, 404 (1984), the Supreme Court declared that "[a] right of privacy in traditional Fourth Amendment terms is fundamentally incompatible with the close and continual surveillance of inmates and their cells required to ensure institutional security and internal order." Since *Hudson*, there has been considerable uncertainty as to whether prison inmates are *ever* entitled to Fourth Amendment protection. *Vernonia School District 47J v. Acton*, 515 U.S. 646, 681, 115 S.Ct. 2386, 2404, 132 L.Ed.2d 564, 592 (1995)(O'Connor, J., dissenting)(noting that it is not clear whether people in prison categorically lack the protections of the Fourth Amendment); *Graham v. Connor*, 490 U.S. 386, 395, 109 S.Ct. 1865, 1871, 104 L.Ed.2d 443, 455 (1989)("Our cases have not resolved the question whether the Fourth Amendment continues to provide individuals with protection against the deliberate use of excessive force beyond the point at which arrest ends and pretrial detention begins, and we do not attempt to answer that question today."). The question is important in this case because it is undisputed that Goldhaber was incarcerated at the time of the alleged Fourth Amendment violation.

Some courts have construed *Hudson* to mean that prisoners are categorically excluded from the ambit of Fourth Amendment protection. *Vineyard v. Wilson*, 311 F.3d 1340, 1349, n. 15 (11th Cir.

2002)(recognizing that the Eighth Amendment, rather than the Fourth Amendment, governs the legality of the use of pepper spray in the prison setting); *Valencia v. Wiggins*, 981 F.2d 1440, 1444-1445 (5th Cir. 1993)(questioning whether prison inmates have any Fourth Amendment rights); *Collins v. Kearney*, 2006 WL 2038502, at *2, 2006 U.S. Dist. LEXIS 50244, at *6 (D.Del. July 18, 2006)("The Fourth Amendment proscription against unreasonable searches and seizures does not apply in the prison context."); *Stubbs v. DeRose*, 2006 WL 842305, at *4, 2006 U.S. Dist. LEXIS 18490, at *11 (M.D.Pa. March 29, 2006)("Thus, since Stubbs was in custody during the time of the alleged assaults, the Fourth Amendment does not protect her."); *McCullar v. Babb*, 2006 WL 623604, at *4, 2006 U.S. Dist. LEXIS 13506, at *11-12 (N.D.Ind. March 10, 2006)(indicating, by citation to substantive due process precedents, that a prison inmate's right to bodily privacy is based solely on the Due Process Clause, and that the Fourth Amendment's proscriptions are simply inapplicable in the prison setting).  Other courts have indicated that prisoners retain a limited degree of Fourth Amendment protection during their periods of incarceration. *Moore v. Carwell*, 168 F.3d 234, 237 (5th Cir. 1999)(allowing a male prisoner to proceed with a Fourth Amendment claim where he alleged that he was strip searched by a female guard even though male guards were present and, thus, available to conduct the search themselves); *Hayes v. Marriott*, 70 F.3d 1144, 1146 (10th Cir. 1995)(noting that while the Fourth Amendment does not protect a prisoner's right of privacy in the context of a cell search, prisoners "retain a limited constitutional right to bodily privacy, particularly as to searches viewed or conducted by members of the opposite sex"); *United States v. Solomon*, 2007 WL 1099097, at *2-4, 2007 U.S. Dist. LEXIS 26825, at *6-10 (W.D.Pa. April 11, 2007)(evaluating a Fourth Amendment claim on the basis of a prisoner's subjective expectation of privacy and society's view as to whether that expectation could be

41

viewed as objectively reasonable); *Ostrander v. Horn*, 145 F.Supp.2d 614, 620 (M.D.Pa. 2001)(indicating that while inmates have no general Fourth Amendment right to be free of strip searches, such searches must be "conducted in a reasonable manner" in order to be constitutionally permissible). Given the unsettled nature of the issue, the Court assumes *arguendo* that a prisoner such as Goldhaber could conceivably allege a violation of his Fourth Amendment rights within the prison context.

The Defendants contend that no Fourth Amendment right of Goldhaber was implicated when he was taken from the Cambria County Jail. (Document No. 29, pp. 12-13). The crux of their argument is that since Goldhaber was already in custody at the time of the alleged Fourth Amendment violation, it was legally impossible for him to be subjected to a "seizure." "A person is seized by the police and thus entitled to challenge the government's action under the Fourth Amendment when the officer, by means of physical force or show of authority, terminates or restrains his freedom of movement through means intentionally applied." *Brendlin v. California*, 127 S.Ct. 2400, 2405, 168 L.Ed.2d 132, 138 (2007)(internal citations, quotation marks and emphasis omitted). At the time of the action complained of in this case, Goldhaber's freedom of movement had already been terminated, and he certainly did not end up in prison by accident. Consequently, he had already been "seized" for purposes of the Fourth Amendment, and the Court cannot conceive of a situation in which an incarcerated inmate such as Goldhaber could be subjected to a distinct Fourth Amendment seizure under the facts alleged in the Amended Complaint. It is not clear that a seizure in the prison context could ever violate the Fourth Amendment, even if it is assumed that it is somehow possible for an incarcerated prisoner to be seized. *Elliot v. Lynn*, 38 F.3d 188, 191, n. 3 (5th Cir. 1994)(distinguishing between cell searches and seizures

42

of prisoners through an official's use of excessive force, which never violate the Fourth Amendment, and body cavity searches of prisoners, which may violate the Fourth Amendment under certain circumstances). Even if it is assumed that it is possible for a prisoner to be seized, Goldhaber's Amended Complaint cannot be fairly read to allege a seizure. He alleges only that he was removed from the Cambria County Jail, where he was already in detention, and taken to the Bedford County Jail, in retaliation for his filing of an application for house arrest and/or work release in the Court of Common Pleas of Cambria County. (Document No. 24, p. 26, ¶ 97). This allegation appears to be the sole basis for Goldhaber's Fourth Amendment claims against the Defendants. *Id.* If there is more to his Fourth Amendment claims, he certainly has not gone to great pains to explain his theories to the Court. (Document No. 34, p. 26)(devoting only a single sentence to his Fourth Amendment claims). Since Goldhaber was already incarcerated at the time of the alleged "seizure," the Court agrees with the Defendants' contention that he was not seized for purposes of the Fourth Amendment when he was moved from Cambria County to Bedford County. (Document No. 29, pp. 12-13). The Court does not believe that Goldhaber properly alleges a seizure. Moreover, he makes no allegations of an illegal search. No matter how outrageous or egregious a governmental actor's conduct may be, it cannot violate the Fourth Amendment if it does not amount to a search or seizure. *McCoy v. Harrison*, 341 F.3d 600, 605-606 (7th Cir. 2003). Goldhaber alleges no violation of the Fourth Amendment, and the Defendants' Motion to Dismiss will be granted with respect to his Fourth Amendment claims.

Goldhaber claims that the Defendants violated his rights under the Eighth Amendment. (Document No. 34, p. 25). The Eighth Amendment provides that "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. CONST. amend. VIII.

43

The Cruel and Unusual Punishment Clause of the Eighth Amendment is applicable to the States because of its incorporation within the Due Process Clause of the Fourteenth Amendment. *United States v. Georgia*, 546 U.S. 151, 157, 126 S.Ct. 877, 881, 163 L.Ed.2d 650, 658 (2006). In the Amended Complaint, Goldhaber states that he has an Eighth Amendment right to not be "lodged unlawfully in a prison by state officials who lack any jurisdiction or authority to keep him there against his will[.]" (Document No. 24, pp. 26-27, ¶ 98). He devotes only one paragraph of his brief to his Eighth Amendment claims. (Document No. 34, p. 25).

The Court does not understand Goldhaber to question the legality of his minimum sentence. Instead, Goldhaber apparently believes that he should have been released immediately after the expiration of his mandatory minimum sentence, and that the Defendants' detention of him for an additional fifteen days constituted a violation of the Cruel and Unusual Punishment Clause. The Defendants contend that Goldhaber's challenge to the duration of his confinement is not cognizable under § 1983. (Document No. 29, pp. 13-14). The Defendants' argument is based on *Heck v. Humphrey*, 512 U.S. 477, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994), in which the Supreme Court declared:

> We hold that, in order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus, 28 U.S.C. § 2254. A claim for damages bearing that relationship to a conviction or sentence that has *not* been so invalidated is not cognizable under § 1983. Thus, when a state prisoner seeks damages in a § 1983 suit, the district court must consider whether a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence; if it would, the complaint must be dismissed unless the plaintiff can demonstrate that the conviction

44

> or sentence has already been invalidated. But if the district court determines that the
> plaintiff's action, even if successful, will *not* demonstrate the invalidity of any
> outstanding criminal judgment against the plaintiff, the action should be allowed to
> proceed, in the absence of some other bar to the suit.

*Heck*, 512 U.S. at 486-487, 114 S.Ct. at 2372-2373, 129 L.Ed.2d at 394-395 (emphasis in original; footnotes omitted). Goldhaber responds by asserting that he exhausted his administrative remedies in prison, and that his action is not barred by 42 U.S.C. § 1997e(a). (Document No. 34, p. 25). Goldhaber responds to an argument that the Defendants do not make. The Defendants do not argue that Goldhaber failed to exhaust administrative remedies. Instead, they argue that his § 1983 action is not cognizable to the extent that it is based on a challenge to the duration of his confinement. *Heck*, 512 U.S. at 489, 114 S.Ct. at 2373, 129 L.Ed.2d at 396 ("We do not engraft an exhaustion requirement upon § 1983, but rather deny the existence of a cause of action. Even a prisoner who has fully exhausted available state remedies has no cause of action under § 1983 unless and until the conviction or sentence is reversed, expunged, invalidated, or impugned by the grant of a writ of habeas corpus."). Goldhaber fundamentally misunderstands the nature of the *Heck* inquiry.

Under the facts alleged in the Amended Complaint, it is clear that Goldhaber's Eighth Amendment claims are barred to the extent that they are based on his alleged confinement beyond the 90-day minimum sentence imposed by Judge George. Goldhaber challenges the denial of parole itself, which directly impacts the legality of the duration of his confinement. In *Wilkinson v. Dotson*, 544 U.S. 74, 80-82, 125 S.Ct. 1242, 1247-1248, 161 L.Ed.2d 253, 262-263 (2005), the Supreme Court held that challenges to parole *procedures* are cognizable under § 1983, since the invalidation of such a procedure does not necessarily mean that a particular prisoner is entitled to parole. In *Wilkinson*, the plaintiffs

45

sought the invalidation of state procedures used to deny "parole eligibility" and "parole suitability." *Wilkinson*, 544 U.S. at 82, 125 S.Ct. at 1248, 161 L.Ed.2d at 262. Since they were not seeking relief that would have required their release, their actions were not barred by *Heck. Id.* In this case, however, Goldhaber specifically argues that the *duration* of his confinement (i.e., his detention for fifteen days beyond the 90-day minimum sentence imposed by Judge George) constituted a violation of the Cruel and Unusual Punishment Clause. (Document No. 34, p. 25). Goldhaber's success in this § 1983 action, to the extent that it is based on the length of his detention, would necessarily demonstrate the invalidity of the Defendants' alleged decision not to grant him parole immediately after the expiration of his 90-day minimum sentence. Goldhaber does not allege that the duration of his confinement was in any way impugned by a subsequent judicial or executive action. The fact that Goldhaber's *sentence* (i.e., imprisonment of no less than 90 days nor more than one day less than five years) would not be rendered invalid if Goldhaber were to prevail in this § 1983 action is of no dispositive significance. "*Heck* uses the word 'sentence' interchangeably with such other terms as 'continuing confinement' and 'imprisonment.'" *Wilkinson*, 544 U.S. at 83, 125 S.Ct. at 1249, 161 L.Ed.2d at 263. It is clear that *Heck* bars this challenge to the alleged temporary denial of Goldhaber's parole, since the United States Court of Appeals for the Third Circuit recently held that *Heck* barred a plaintiff from using § 1983 to challenge a parole board's decision to revoke his parole. *Williams v. Consovoy*, 453 F.3d 173, 177 (3d Cir. 2006)("Thus, the threshold question becomes whether Williams's success on his § 1983 action would 'necessarily demonstrate' the invalidity of the Parole Board's decision to revoke his parole, which would in turn render his § 1983 action uncognizable under *Heck*. We answer this question in the affirmative because success on the § 1983 claim would necessarily demonstrate the invalidity of the

46

Parole Board's decision."). Therefore, the Defendants' Motion to Dismiss will be granted with respect to Goldhaber's Eighth Amendment claims.[3]

Goldhaber appears to allege various Fourteenth Amendment violations. The Amended Complaint is very unclear as to the precise nature of these different theories. Nevertheless, it appears that Goldhaber alleges violations of the Equal Protection Clause and the Due Process Clause. (Document No. 24, pp. 26-28, ¶¶ 96-101). The relevant portion of the Fourteenth Amendment provides that "No State shall . . . deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." U.S. CONST. amend. XIV. Goldhaber apparently believes that he is entitled to relief under both the substantive and the procedural components of the Due Process Clause. The Court will begin the Fourteenth Amendment analysis by addressing Goldhaber's claims under the Equal Protection Clause.

---

3

As far as the Court can tell, Goldhaber's Eighth Amendment claims are based solely on the alleged denial of his parole after the expiration of his 90-day minimum prison sentence. This limited basis for his Eighth Amendment claims is implicit in the abbreviated treatment (and identical language) accorded these issues in both the Amended Complaint and Goldhaber's brief. (Document Nos. 24, pp. 26-27, ¶ 98, 34, p. 25)("Plaintiff has an Eighth Amendment right not to be lodged unlawfully in a prison by state officials who lack jurisdiction or authority to keep him there against his will as they did in this case. Such misconduct constitutes cruel and unusual punishment."). Some courts have recognized that otherwise permissible forms of solitary confinement may violate the Eighth Amendment if they are either inappropriately imposed or imposed for an excessive period of time. *Jackson v. Meachum*, 699 F.2d 578, 582 (1ˢᵗ Cir. 1983); *O'Brien v. Moriarty*, 489 F.2d 941, 944 (1ˢᵗ Cir. 1974); *Morris v. Travisono*, 549 F.Supp. 291, 294 (D.R.I. 1982). Goldhaber does not allege that he was in solitary confinement for an extended period of time. In fact, he specifically avers that his solitary confinement ended when he signed a waiver. (Document No. 24, p. 20, ¶ 74). He does not allege that the conditions of his confinement subjected him to unnecessary physical pain. *Hope v. Pelzer*, 536 U.S. 730, 738, 122 S.Ct. 2508, 2514, 153 L.Ed.2d 666, 677 (2002). The Court does not understand his Eighth Amendment claims to be based on any of these alternative theories. Even if it is Goldhaber's subjective intent to base his Eighth Amendment claims on more than just the 15-day delay in his release from prison, he has failed to articulate as much in the Amended Complaint. Even under the Federal Judiciary's relaxed system of notice pleading, it is incumbent upon the plaintiff to provide fair notice as to both the nature of a claim and the *grounds on which that claim rests*. *Bell Atlantic Corporation v. Twombly*, 127 S.Ct. 1955, 1965, 167 L.Ed.2d 929, 940, n. 3 (2007). The Amended Complaint cannot be fairly read to put the Defendants on notice that Goldhaber's Eighth Amendment claims rest on any allegations other than those directly related to the delay in his release. Accordingly, Goldhaber's Eighth Amendment claims are barred by *Heck* and, consequently, not cognizable under § 1983.

Goldhaber is not very specific with respect to his theory under the Equal Protection Clause. (Document No. 24, p. 26, ¶ 96)("In addition, the defendants violated the plaintiff's equal protection of the law's rights by imposing unequal and excessively harsh prison conditions upon the plaintiff."). The context of the Amended Complaint makes it clear that Goldhaber does not challenge the constitutionality of a statute, but rather contends that the actions of executive officials violated his rights under the Equal Protection Clause. The principle that the Equal Protection Clause limits the actions of executive officials, as well as the permissible scope of legislative enactments, is firmly embedded within the jurisprudence of the Supreme Court. *Yick Wo v. Hopkins*, 118 U.S. 356, 373-374, 6 S.Ct. 1064, 1072-1073, 30 L.Ed. 220, 227-228 (1886). The purpose of the Equal Protection Clause is "to secure every person within the State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents." *Sioux City Bridge Company v. Dakota County*, 260 U.S. 441, 445, 43 S.Ct. 190, 191, 67 L.Ed. 340, 342 (1923). Moreover, the mandates of the Equal Protection Clause are applicable in the prison context. *Johnson v. California*, 543 U.S. 499, 511, 125 S.Ct. 1141, 1150, 160 L.Ed.2d 949, 962 (2005). Where a classification is drawn in such a way as to discriminate on an "inherently suspect" basis or to burden the exercise of a fundamental right, a reviewing court must apply the most rigorous level of scrutiny known to constitutional law. *Johnson*, 543 U.S. at 511, 125 S.Ct. at 1150, 160 L.Ed.2d at 962 ("In the prison context, when the government's power is at its apex, we think that searching judicial review of racial classifications is necessary to guard against invidious discrimination."); *Austin v. Michigan State Chamber of Commerce*, 494 U.S. 652, 666, 110 S.Ct. 1391, 1401, 108 L.Ed.2d 652, 669 (1990)("Because the right to engage in political expression is fundamental to our constitutional system,

48

statutory classifications impinging upon that right must be narrowly tailored to serve a compelling governmental interest."). Goldhaber does not allege that he is a member of a class which renders the Defendants' alleged discrimination against him inherently suspect. While it could be argued that the alleged classification in this case (i.e., a class of one) burdened the exercise of Goldhaber's rights under the Petition Clause, the Court need not determine the precise contours of the threshold necessary for Goldhaber to establish a violation of the Equal Protection Clause, or the showing that must be made by the Defendants in order to defeat Goldhaber's Equal Protection Clause claims. The Court is convinced that, at a minimum, Goldhaber alleges violations of the Equal Protection Clause even if it is assumed that no heightened scrutiny is applicable in this case.

In *Village of Willowbrook v. Olech*, 528 U.S. 562, 564, 120 S.Ct. 1073, 1074, 145 L.Ed.2d 1060, 1063 (2000), the Supreme Court explained that a plaintiff properly alleges a violation of the Equal Protection Clause by averring that he or she "has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." The Fourteenth Amendment forbids a State to "deny to any *person* within its jurisdiction the equal protection of the laws." U.S. CONST. amend. XIV (emphasis added). The word "person" appears in the singular form, indicating that arbitrary or irrational discrimination against a single person runs afoul of the constitutional prohibition. Contrary to the Defendants' contentions, Goldhaber need not allege that he was a member of a broader class in order to allege a violation of the Equal Protection Clause. (Document No. 29, p. 16). Discrimination against a particular individual (i.e., discrimination against a "class of one") violates the Equal Protection Clause when it bears no rational relationship to any legitimate governmental interest. *Olech*, 528 U.S. at 564, 120 S.Ct. at 1074, 145 L.Ed.2d at 1063.

49

Moreover, a State has no legitimate interest in harming or disadvantaging a particular person or group of persons. *Romer v. Evans*, 517 U.S. 620, 633, 116 S.Ct. 1620, 1627, 134 L.Ed.2d 855, 866 (1996)("By requiring that a classification bear a rational relationship to an independent and legitimate legislative end, we ensure that classifications are not drawn for the purpose of disadvantaging the group burdened by the law."). With that in mind, the Court will turn to the specific allegations contained in the Amended Complaint.

Goldhaber alleges that Higgins, Clark, Bowser and the Bedford County Prison Board had discussions about housing him outside of Bedford County for the purported purpose of preventing an uproar among the inmates. (Document No. 24, p. 12, ¶ 39). He contends that this stated purpose was merely a pretext to make it virtually impossible for him to avail himself of work release. After his application for work release was granted by the Court of Common Pleas of Cambria County, Goldhaber was allegedly taken to the Bedford County Jail, where he was regularly placed with other inmates for extended periods of time. (Document No. 24, pp. 16-17, ¶ 55). In his view, this reality casts doubt on the Defendants' prior justification for housing him outside of Bedford County (i.e., that his presence in the Bedford County Jail would cause an uproar among the inmates).[4] Upon his arrival in Bedford County, Clark allegedly told Goldhaber that he would be kept in solitary confinement for an indefinite period of time. (*Id.*, p. 17, ¶ 56). After Goldhaber was transferred to Adams County, he was allegedly placed in solitary confinement by Wypijewski. (*Id.*, p. 20, ¶ 72). Goldhaber contends that the

4

The Defendants do not argue that consideration of the rationality of Goldhaber's initial incarceration outside of Bedford County, to the extent that such an arrangement was approved by a Pennsylvania court, is precluded by 28 U.S.C. § 1738. The Court expresses no opinion as to the possible collateral estoppel effect of any determinations made by Judge George.

Defendants engaged in a conspiracy to prevent him from availing himself of the work release permitted under the orders which had been issued by Judge George and Judge Long. (*Id.*, pp. 18-19, ¶¶ 64-65). He also alleges that it was customary in Bedford County for those convicted of a DUI-related offense to be released after the expiration of the applicable minimum sentence, but that he was confined for an additional fifteen days. (*Id.*, p. 2).

As noted earlier, Goldhaber's claims related to his confinement beyond the expiration of his minimum sentence are barred by *Heck*. Nevertheless, the Amended Complaint alleges additional conduct on the part of the Defendants which indicates the presence of arbitrary, irrational discrimination against Goldhaber for the specific purpose of preventing him from participating in the work release program. No State has a legitimate interest in imposing arbitrary and unique harm upon a particular individual or group of individuals. *Romer*, 517 U.S. at 633, 116 S.Ct. at 1627, 134 L.Ed.2d at 866. To the extent that Goldhaber alleges that the Defendants conspired to inflict arbitrary, capricious and irrational harm upon him (which was not inflicted upon any other inmates), he alleges violations of the Equal Protection Clause.[5]

It remains to be determined whether Clark, Bowser and Wypijewski are entitled to qualified immunity with respect to Goldhaber's claims under the Equal Protection Clause. As noted earlier, however, the Equal Protection Clause's prohibition of arbitrary and irrational discrimination is firmly

---

[5]

The Supreme Court has recognized that prisoners may invoke the protections of the Equal Protection Clause even where they do not allege a deprivation of a constitutionally protected liberty or property interest. *Sandin v. Conner*, 515 U.S. 472, 487, 115 S.Ct. 2293, 2302, 132 L.Ed.2d 418, 432, n. 11 (1995)("Prisoners such as Conner, of course, retain other protection from arbitrary state action even within the expected conditions of confinement. They may invoke the First and Eighth Amendments and the Equal Protection Clause of the Fourteenth Amendment where appropriate, and may draw upon internal prison grievance procedures and state judicial review where available."). Consequently, Goldhaber's failure to allege that he was deprived of a liberty or property interest is not fatal to his claim under the Equal Protection Clause.

51

embedded within the jurisprudence of the Supreme Court.[6] *Olech*, 528 U.S. at 564, 120 S.Ct. at 1074, 145 L.Ed.2d at 1063; *Romer*, 517 U.S. at 633, 116 S.Ct. at 1627, 134 L.Ed.2d at 866. The Defendants are alleged to have treated Goldhaber arbitrarily (and, therefore, differently from the other inmates) not for the purpose of maintaining order in the prison context, but for the express purpose of visiting unique harms upon Goldhaber. *Davis v. Lester*, 156 F.Supp.2d 588, 595 (W.D.Va. 2001)("While he has not yet alleged specific facts concerning whether the defendants treated similarly situated, white inmates differently, the court cannot find at this point in the litigation that he would be unable to prove a set of facts to support this element of his claim, with the benefits of discovery."). The facts alleged in the Amended Complaint are very unusual, but the novelty of the allegations does not negate the Defendants' fair notice that such arbitrary and irrational discrimination, imposed for an illicit purpose, ran afoul of the Equal Protection Clause. *Hope*, 536 U.S. at 741, 122 S.Ct. at 2516, 153 L.Ed.2d at 679; *Lanier*, 520 U.S. at 271, 117 S.Ct. at 1227, 137 L.Ed.2d at 446. The allegations contained in the Amended Complaint are not consistent with conduct of which a reasonable official in the shoes of Clark, Bowser or Wypijewski would believe to be legal. For this reason, they are not entitled to qualified immunity at this stage. Nonetheless, they remain free to raise the defense of qualified immunity at a later stage if the evidence does not support Goldhaber's allegations of arbitrary, irrational and spiteful discrimination. *Behrens*, 516 U.S. at 309, 116 S.Ct. at 840, 133 L.Ed.2d at 785-786.

Goldhaber also alleges that the Defendants violated his rights under the Due Process Clause of

---

6

Because Goldhaber properly alleges violations of the Petition Clause and the Equal Protection Clause, the Defendants' argument that the conspiracy alleged in the Amended Complaint implicated no federally protected right is clearly without merit. (Document No. 29, pp. 16-17).

the Fourteenth Amendment. Unfortunately, Goldhaber is so vague as to the nature of his Due Process Clause claims that it is difficult for the Court to determine the theory under which he purports to proceed. (Document No. 24, pp. 27-28, ¶ 101)("Therefore, plaintiff alleges that these defendants have used the criminal process and their unique access to it as elected and appointed officials to abuse and violate the plaintiff's right to substantive and procedural due process of law and that the actions of these defendants have been arbitrary and capricious to such an extreme degree as to shock the conscience."). Unlike the Equal Protection Clause, which protects an individual from irrational discrimination or disparate treatment unjustifiable by any legitimate governmental interest, the Due Process Clause (in both its procedural and substantive manifestations) protects against unconstitutional deprivations of life, liberty or property. U.S. CONST. amend. XIV, § 1. It does not protect everything that might be described as a benefit. *Town of Castle Rock v. Gonzales*, 125 S.Ct. 2796, 2803, 162 L.Ed.2d 658, 668 (2005). In order to proceed with his claims under the Due Process Clause, Goldhaber must allege, at a minimum, that the actions of the Defendants constituted a *deprivation* of his liberty or property interests. *College Savings Bank v. Florida Prepaid Postsecondary Education Expense Board*, 527 U.S. 666, 674, 119 S.Ct. 2219, 2225, 144 L.Ed.2d 605, 615 (1999)(explaining that not everything which *protects* property interests is designed to provide a remedy for, or to prevent, *deprivations* of those property interests). He cannot establish a deprivation of a liberty or property interest without first *identifying* such an interest.

The Defendants contend that Goldhaber, as an incarcerated prisoner, had no liberty or property interest in obtaining work release or house arrest. (Document No. 28, p. 8, ¶ 41). The Court agrees with this argument. With respect to Goldhaber's procedural due process claims (to the extent that he

53

intends to proceed under a theory of procedural due process), the Supreme Court has rejected "the notion that *any* grievous loss visited upon a person by the State is sufficient to invoke the procedural protections of the Due Process Clause." *Meachum v. Fano*, 427 U.S. 215, 224, 96 S.Ct. 2532, 2538, 49 L.Ed.2d 451, 458 (1976)(emphasis in original). "The Due Process Clause standing alone confers no liberty interest in freedom from state action taken within the sentence imposed." *Sandin v. Conner*, 515 U.S. 472, 480, 115 S.Ct. 2293, 2298, 132 L.Ed.2d 418, 427 (1995)(internal quotation marks omitted). Under certain circumstances, States may create liberty interests that are entitled to due process protection. Such interests, however, are "generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin*, 515 U.S. at 484, 115 S.Ct. at 2300, 132 L.Ed.2d at 430. In order to allege a deprivation of a liberty interest (which, in turn, would entitle Goldhaber to "due process of law"), Goldhaber must allege that the actions of the Defendants imposed harm upon him beyond "the range of confinement to be normally expected" for someone serving a sentence such as that which was imposed upon him. *Sandin*, 515 U.S. at 487, 115 S.Ct. at 2302, 132 L.Ed.2d at 432.

The Defendants correctly assert that Goldhaber had no constitutionally protected liberty interest in being confined to a facility of his choosing. (Document No. 29, p. 15). It is axiomatic that "[c]onfinement in any of the State's institutions is within the normal limits or range of custody which the conviction has authorized the State to impose." *Meachum*, 427 U.S. at 225, 96 S.Ct. at 2538, 49 L.Ed.2d at 459. "That life in one prison is much more disagreeable than in another does not in itself signify that a Fourteenth Amendment liberty interest is implicated when a prisoner is transferred to the

54

institution with the more severe rules." *Id.* Although Goldhaber alleges that he was sometimes confined in facilities too far away from his office to avail himself of work release, he does not properly allege that he was deprived of a constitutionally protected liberty interest. While he alleges that he was placed in solitary confinement in both Bedford County and Adams County, he does not allege any additional conditions of incarceration which rendered his confinement "atypical" of the "ordinary incidents of prison life." (Document No. 24, pp. 17, ¶ 56, 24, p. 20, ¶ 72). No allegation is made that his placement in solitary confinement was for a substantial duration of time, or that it somehow decreased his opportunity for parole consideration. *Wilkinson v. Austin*, 545 U.S. 209, 223-224, 125 S.Ct. 2384, 2394-2395, 162 L.Ed.2d 174, 190-191 (2005)(holding that a prisoner had a liberty interest in avoiding confinement in the Ohio State Penitentiary because placement there, which was reviewed only on an annual basis after an initial 30-day review, disqualified an inmate from being considered for parole). Indeed, Goldhaber's solitary confinement in Adams County apparently ended when he signed a waiver of liability. (Document No. 24, p. 20, ¶ 74). The allegations contained in the Amended Complaint are insufficient to establish that Goldhaber suffered a *deprivation* for purposes of the Due Process Clause, since he has failed to establish the existence of a constitutionally protected liberty interest.

Even if the Court were to assume *arguendo* that Goldhaber was deprived of a liberty interest under the facts alleged in the Amended Complaint, his procedural due process claims would still be insufficient to survive the Defendants' Motion to Dismiss. He does not allege that any procedural protections provided under Pennsylvania law are unconstitutional. Instead, he appears to allege that the Defendants engaged in random, unauthorized conduct. The unusual circumstances of this case belie

any contention that Pennsylvania could have predicted conduct of the sort allegedly engaged in by the Defendants, or that predeprivation process could have somehow prevented the abuses of power that are alleged to have taken place. *Zinermon v. Burch*, 494 U.S. 113, 136-139, 110 S.Ct. 975, 989-990, 108 L.Ed.2d 100, 121-122 (1990)(holding that predeprivation process could have prevented an incompetent mental patient from committing himself to a mental hospital without the procedural protections afforded involuntarily committed patients because the alleged erroneous "deprivation" of liberty was both easy to foresee and capable of being prevented). Where the random, unauthorized actions of state officials effect a "deprivation" of liberty or property, the State satisfies its procedural due process obligations by providing an adequate postdeprivation remedy (i.e., an opportunity for the plaintiff to commence a tort action against the officials who illegally effected the "deprivation"). *Daniels v. Williams*, 474 U.S. 327, 328, 106 S.Ct. 662, 663, 88 L.Ed.2d 662, 666 (1986); *Hudson*, 468 U.S. at 530-537, 104 S.Ct. at 3203-3205, 82 L.Ed.2d at 405-409; *Parratt v. Taylor*, 451 U.S. 527, 535-544, 101 S.Ct. 1908, 1913-1917, 68 L.Ed.2d 420, 429-434 (1981). Goldhaber does not aver that Pennsylvania law fails to provide an adequate postdeprivation remedy. *County of Sacramento v. Lewis*, 523 U.S. 833, 840, 118 S.Ct. 1708, 1714, 140 L.Ed.2d 1043, 1054, n. 4 (1998)("Respondents do not argue that they were denied due process of law by virtue of the fact that California's post-deprivation procedures and rules of immunity have effectively denied them an adequate opportunity to seek compensation for the state-occasioned deprivation of their son's life."). The Due Process Clause, in its procedural manifestation, does not prohibit all deprivations of life, liberty or property, but only deprivations of such interests *without due process of law*. U.S. CONST. amend. XIV. Since Goldhaber identifies *neither* a constitutionally deficient procedure which purported to authorize the actions of the Defendants nor a lack of an adequate

56

postdeprivation remedy (if Goldhaber believes that the actions of the Defendants were random and, hence, unauthorized under Pennsylvania law), he fails to allege a procedural due process violation. It is incumbent upon Goldhaber to give the Defendants fair notice of both the *nature* of his claims and the *grounds* upon which those claims rest. *Bell Atlantic Corporation v. Twombly*, 127 S.Ct. 1955, 1965, 167 L.Ed.2d 929, 940, n. 3 (2007). The Amended Complaint is woefully inadequate to satisfy this standard insofar as it purports to allege a procedural due process violation. Consequently, the Court will grant the Defendants' Motion to Dismiss with respect to Goldhaber's procedural due process claims.[7]

Goldhaber also appears to allege substantive due process violations. (Document No. 24, pp. 27-28, ¶ 101). Neither party offers much legal analysis as to the cognizability of Goldhaber's substantive due process claims. (Document Nos. 29, p. 15, 34, pp. 24-25). Nonetheless, the Court notes that the Supreme Court "has always been reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended." *Collins v. City of Harker Heights*, 503 U.S. 115, 125, 112 S.Ct. 1061, 1068, 117 L.Ed.2d 261, 273 (1992). The novelty of the facts alleged in the Amended Complaint makes the substantive due process issues in this case all the more complicated, since "[r]ules of due process are not [] subject to mechanical application in unfamiliar territory." *Lewis*, 523 U.S. at 850, 118 S.Ct. at 1718, 140 L.Ed.2d at 1060. In a challenge to executive action under the Due Process Clause, "the threshold question is whether the behavior of

---

7

The Amended Complaint is so vague with respect to Goldhaber's procedural due process claims that the Court is itself unable to determine the precise theory upon which Goldhaber attempts to rely. *Bell Atlantic Corporation v. Twombly*, 127 S.Ct. 1955, 1965, 167 L.Ed.2d 929, 940 (2007)(explaining that "a formulaic recitation of the elements of a cause of action" will not suffice to survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), and that the factual allegations contained in a complaint "must be enough to raise a right to relief above the speculative level").

the governmental officer is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Lewis*, 523 U.S. at 847, 118 S.Ct. at 1717, 140 L.Ed.2d at 1058, n. 8. Negligent conduct is categorically below the conscience-shocking level of culpability needed to establish a violation of the Due Process Clause. *Davidson v. Cannon*, 474 U.S. 344, 348, 106 S.Ct. 668, 670, 88 L.Ed.2d 677, 683 (1986)("The guarantee of due process has never been understood to mean that the State must guarantee due care on the part of its officials."). On the other hand, "conduct intended to injure in some way unjustifiable by any governmental interest is the sort of official action most likely to rise to the conscience-shocking level." *Lewis*, 523 U.S. at 849, 118 S.Ct. at 1718, 140 L.Ed.2d at 1059. "Whether the point of the conscience-shocking is reached when injuries are produced with culpability falling within the middle range, following from something more than negligence but less than intentional conduct, such as recklessness or gross negligence, is a matter for closer calls." *Lewis*, 523 U.S. at 849, 118 S.Ct. at 1718, 140 L.Ed.2d at 1059 (citation and internal quotation marks omitted).

The critical question is whether Goldhaber's allegations are the proper subject of a substantive due process analysis. The generalized, imprecise notion of "substantive due process" is inapplicable where a particular provision of the Bill of Rights is directly applicable to a claim. *Albright v. Oliver*, 510 U.S. 266, 273, 114 S.Ct. 807, 813, 127 L.Ed.2d 114, 123-124 (1994)(plurality opinion). It cannot be doubted that substantive due process protections can sometimes manifest themselves in the prison context. *Doe v. Delie*, 257 F.3d 309, 323 (3d Cir. 2001)(determining that prisoners retain a substantive due process right to the privacy of their medical information). Nevertheless, because of the unique nature of incarceration, the conditions of a prisoner's confinement are generally governed by the Eighth Amendment's ban on cruel and unusual punishment rather than on the substantive component of the

58

Due Process Clause.[8] *Mohamed v. Tattum*, 380 F.Supp.2d 1214, 1223-1224 (D.Kan. 2005)(holding that a failure-to-protect claim in the prison setting is governed by the Eighth Amendment rather than the notion of substantive due process). The Court does not understand Goldhaber to argue that he had an Eighth Amendment right to work release, or to be incarcerated in close proximity to his law office. It is difficult to fathom how he could have a substantive due process right to such luxuries. The Court has already determined that Goldhaber had no liberty interest in work release. Although Judge George granted Goldhaber's petition for work release, his eligibility for work release was *subject to the rules and regulations of the facility in which he was incarcerated.* (Document Nos. 12, p. 13, 28, p. 14). When Judge Long granted Goldhaber's application for work release upon his arrival in Cambria County, it is clear that such work release was meant to be coextensive with, and not in excess of, Judge George's prior order. (Document Nos. 12, pp. 18-19, 28, pp. 19-20). Although "conduct intended to injure in some way unjustifiable by any governmental interest is the sort of official action most likely to rise to the conscience-shocking level[,]" the relevant *injury* must be to one's *life*, *liberty*, or *property*. *Lewis*, 523 U.S. at 849, 118 S.Ct. at 1718, 140 L.Ed.2d at 1059. Absent a liberty or property interest in work release, or in being housed in a correctional facility of his choosing, Goldhaber cannot proceed

---

8

The Court does not understand the basis for Goldhaber's Eighth Amendment claims. The Amended Complaint states: "Plaintiff has an 8th Amendment right not to be lodged unlawfully in a prison by state officials who lack any jurisdiction or authority to keep him there against his will as they did in this case. Such conduct constitutes cruel and unusual punishment." (Document No. 24, pp. 26-27, ¶ 98). The Court assumes (as the Defendants apparently assume) that Goldhaber's Eighth Amendment argument is based on his detention for fifteen days beyond his minimum sentence. As noted earlier, this argument is foreclosed by *Heck*, since Goldhaber's confinement has neither been invalidated nor impugned. The characterization of his incarceration as unlawful for the duration of his minimum sentence would make no sense, since the Court does not understand him to allege that his conviction was somehow unlawful. To some extent, Goldhaber appears to base his Eighth Amendment claims on a theory of retaliation. (*Id.*, p. 24, ¶ 96)("Plaintiff also has a right to access and talk to an attorney along with an 8th amendment right to be free of cruel and unusual punishments."). That issue, however, is more properly dealt with in the Petition Clause context, since Goldhaber does not allege facts even remotely approaching the cruel and unusual conditions needed to establish a violation of the Cruel and Unusual Punishment Clause.

with his substantive due process claims. This would be true even if the Court were to assume *arguendo* that his allegations are not covered by the Eighth Amendment, thereby making substantive due process analysis appropriate. Accordingly, the Court will grant the Defendants' Motion to Dismiss with respect to Goldhaber's substantive due process claims.

The Defendants argue that the Amended Complaint does not sufficiently allege conduct fairly attributable to the Bedford County Prison Board to justify the imposition of liability against it. (Document No. 29, pp. 17-18). There is no *respondeat superior* liability under § 1983. In order to prevail in his claims against the Board, Goldhaber must allege that the Board, "through its *deliberate* conduct, [] was the 'moving force' behind the injury alleged." *Board of County Commissioners of Bryan County v. Brown*, 520 U.S. 397, 404, 117 S.Ct. 1382, 1388, 137 L.Ed.2d 626, 639 (1997)(emphasis in original). The Amended Complaint contains allegations that the Board was itself involved in the decisions alleged to have been made concerning the conditions of Goldhaber's confinement. (Document No. 24, p. 12, ¶ 39). It appears that the actions of the Board, Higgins and Clark may have been somewhat intertwined, since Higgins and Clark were both members of the Board. (*Id.*, p. 14, ¶ 47). Goldhaber specifically alleges that the Board was directly involved in the decision to house him in Adams County, which was done at Bedford County's expense. (*Id.*, p. 15, ¶ 48). The allegations concerning Goldhaber's incarceration in Adams County are central to his Petition Clause claims, since his transfer from Cambria County to Adams County (with an intervening period of time spent in Bedford County) allegedly occurred in retaliation for his filing of an application for work release in the Court of Common Pleas of Cambria County. (*Id.*, pp. 16-18, ¶¶ 55-60). The Court is convinced that the Amended Complaint sufficiently alleges specific conduct by the Board to warrant

the potential imposition of liability upon it. *Brown*, 520 U.S. at 404, 117 S.Ct. at 1388, 137 L.Ed.2d at 639 ("Where a plaintiff claims that a particular municipal action *itself* violates federal law, or directs an employee to do so, resolving these issues of fault and causation is straightforward."). Therefore, the Court will deny the Defendants' Motion to Dismiss to the extent that it seeks the dismissal of Goldhaber's claims against the Board arising under the Petition Clause and the Equal Protection Clause.

Goldhaber apparently believes that the conduct alleged in the Amended Complaint is actionable under Pennsylvania law. (Document No. 24, p. 27, ¶ 100). Nonetheless, he utterly fails to articulate a theory under which he intends to proceed. A generalized reference to the tort law of Pennsylvania is not sufficient to survive the Defendants' Motion to Dismiss. *Bell Atlantic Corporation*, 127 S.Ct. at 1965, 167 L.Ed.2d at 940, n. 3 (explaining that a plaintiff must provide fair notice of both the *nature* of his or her claims and the *grounds* upon which those claims rest). The Amended Complaint fails to identify a common law tort theory under which Goldhaber could proceed in accordance wi th Pennsylvania law. For this reason, all of Goldhaber's claims under Pennsylvania law (if he believes that he has any) will be dismissed.

Pursuant to Federal Rule of Civil Procedure 12(f), which allows the Court to strike "from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter[,]" the Defendants ask the Court to strike paragraphs 10, 11, 12, 13, 14, 16, 17, 19 and 20 of the Amended Complaint. (Document No. 28, pp. 9-10, ¶¶ 48-49). They contend that these averments are designed solely to defame Higgins. (Document No. 29, pp. 22-26). Goldhaber argues that these averments are relevant for the purpose of establishing Higgins' motive for participating in the conspiracy. (Document No. 34, pp. 28-31). The Court notes that motions to strike are often denied if the moving party is unable

61

to make a showing of prejudice. *Great West Life Assurance Company v. Levithan*, 834 F.Supp. 858, 864 (E.D.Pa. 1993). The Court has already determined that Goldhaber must file a more definite statement so that the issue of absolute immunity can be dealt with at the earliest possible stage in the litigation. This need for a more definite statement essentially moots the Defendants' Motion to Strike. Hence, it will be denied at this time. Nonetheless, Goldhaber's extensive argument concerning this issue is drastically out of proportion with his abbreviated arguments concerning the bases for his constitutional claims. (Document No. 34, pp. 21-31). It behooves him to focus his energy on the legal issues in this case, and to avoid focusing on the details of Higgins' alleged improprieties, throughout the course of this litigation.

## C. The Claims Against Hershey and Benton

Goldhaber also alleges that Hershey and Benton violated his legal rights. Exactly what rights they allegedly violated, however, is anybody's guess. Hershey and Benton have filed a Motion to Dismiss and/or Motion for Summary Judgment, which the Court will treat as a Motion to Dismiss. (Document No. 30). In their brief, they advance arguments as to why Goldhaber cannot proceed against them for false arrest and/or malicious prosecution. (Document No. 31, pp. 4-20). In his responsive brief, Goldhaber indicates that he is *not* suing Hershey and Benton for false arrest or malicious prosecution (at least not at the present time). (Document No. 33, pp. 5, 18-19). Nevertheless, he does not explain what claims he is making against them. The allegations in the Amended Complaint against these two police officers are limited to the assertion that Hershey (the officer who arrested Goldhaber) wanted to "get" him in retaliation for his advocacy of criminal defendants in Bedford County, and the assertion that Benton is working with Higgins and Bowser to get him arrested (which, in turn, would

62

lead to the revocation of his probation). (Document No. 24, pp. 1-2, ¶ 1, 24-25, ¶¶ 90-94). Goldhaber also alleges that Hershey's arrest of him was based on fabricated evidence and false information. (*Id.*, p. 4, ¶ 6). These statements amount to nothing more than "bald assertions" which the Court need not credit in deciding the instant Motion to Dismiss. *Morse*, 132 F.3d at 906.

Since Goldhaber has disavowed any reliance on the theories of liability discussed in the brief filed by Hershey and Benton, it is incumbent upon him to explain to the Court exactly what legal basis he has for suing them.[9] He devotes a considerable amount of his brief to explaining why Hershey and Benton do not enjoy different forms of immunity, but he makes no attempt to explain the legal theory under which he wishes to proceed against them. (Document No. 33, pp. 1-21). He accuses Hershey of committing perjury during the course of his criminal trial. (*Id.*, p. 19). A mere accusation of perjury, however, does not entitle Goldhaber to relief in a civil action against Hershey.

The Motion to Dismiss filed by Hershey and Benton, the brief filed in support thereof, and

9

Hershey and Benton apparently construed Goldhaber's claims against them to be based on false arrest and/or malicious prosecution theories. They contend that Goldhaber's false arrest claim is barred by the statute of limitations, and that consideration of this claim on the merits would be precluded by 28 U.S.C. § 1738 even if the claim had been filed in a timely manner. (Document No. 31, pp. 4-7). They also argue that the allegations contained in the Amended Complaint would not entitle Goldhaber to relief under either a false arrest or a malicious prosecution theory, even if the Court were to address these claims on the merits. (*Id.*, pp. 7-20). Instead of addressing the arguments raised by Hershey and Benton, Goldhaber advises the Court to ignore those arguments, contending that they are irrelevant because he is not basing his claims on a false arrest or malicious prosecution theory. (Document No. 33, pp. 5, 18-19). Given this response by Goldhaber, there is no need for the Court to address the specific arguments raised by Hershey and Benton, since those arguments do not relate to Goldhaber's Amended Complaint. Nonetheless, Goldhaber fails to explain what constitutional, statutory or common law basis he has for suing Hershey and Benton, leaving them unable to defend themselves in a coherent manner. Goldhaber argues that Hershey and Benton are not entitled to various forms of immunity, but immunity issues are irrelevant if he has no cognizable legal basis for proceeding against them in the first place. (Document No. 33, pp. 7-19). With respect to Hershey and Benton, the Amended Complaint fails to satisfy even the relaxed requirements of the notice pleading system applicable in federal court. *Bell Atlantic Corporation v. Twombly*, 127 S.Ct. 1955, 1964-1965 167 L.Ed.2d 929, 940 (2007). Since Goldhaber cannot articulate a cognizable basis for proceeding against Hershey and Benton, the Court must dismiss the claims against them in their entirety.

63

Goldhaber's responsive brief all indicate that Hershey and Benton have no idea what claims are being made against them. (Document Nos. 30-31, 33). The Amended Complaint is so incoherent as to the legal bases for relief that Hershey and Benton must necessarily guess as to how to defend this lawsuit. As the Supreme Court recently explained in *Bell Atlantic Corporation v. Twombly*, 127 S.Ct. 1955, 1964-1965, 167 L.Ed.2d 929, 940 (2007), "a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do[.]" Even Goldhaber's brief sheds no light on the precise nature of his claims against Hershey and Benton (except for making it clear what they are *not* based on, i.e., false arrest and/or malicious prosecution). (Document No. 33, pp. 5, 18-19). Since Goldhaber utterly fails to articulate any cognizable basis for relief against Hershey and Benton, his claims against these two individuals will be dismissed.

## CONCLUSION

Goldhaber's Amended Complaint does not specify the actions allegedly taken by Judge George with enough specificity to enable the Court to decide the issue of absolute immunity. For this reason, Goldhaber must file a more definite statement, thereby enabling the Court to determine whether the actions allegedly taken by Judge George constituted judicial acts, or whether they c onstituted administrative actions in accordance with his duties as a member of the Adams County Prison Board. *Forrester*, 484 U.S. at 227, 108 S.Ct. at 544, 98 L.Ed.2d at 565 (recognizing "an intelligible distinction between judicial acts and the administrative, legislative, or executive functions that judges may on occasion be assigned by law to perform"); *Thomas*, 463 F.3d at 299-303 (explaining how the tension between the relaxed requirements of notice pleading and the need to resolve issues of immunity at the

earliest possible stage in the litigation can be resolved by the filing of a more definite statement pursuant to Federal Rule of Civil Procedure 12(e)). The Amended Complaint does not allege conduct sufficient to establish violations of the Fourth and Eighth Amendments, nor does it allege conduct sufficient to establish procedural and substantive due process violations. Consequently, the Defendants' Motion to Dismiss (Document No. 28) must be granted with respect to Goldhaber's claims under the Fourth Amendment, the Eighth Amendment, and the Due Process Clause of the Fourteenth Amendment (except insofar as the Due Process Clause is relied upon because of its incorporation of the Petition Clause of the First Amendment). The Amended Complaint, read in the light most favorable to Goldhaber, properly alleges that Judge George, Higgins, Clark, Bowser, Wypijewski and the Board violated his rights under the Petition Clause of the First Amendme nt (which is applicable to Pennsylvania by virtue of the Due Process Clause of the Fourteenth Amendment) and the Equal Protection Clause of the Fourteenth Amendment. Thus, the Defendants' Motion to Dismiss (Document No. 28) must be denied with respect to Goldhaber's claims under the Petition Clause and the Equal Protection Clause. The Amended Complaint is too vague to enable Hershey and Benton to understand the nature of Goldhaber's claims against them. This is evidenced by the reality that they have briefed issues which Goldhaber deems irrelevant. Therefore, Goldhaber fails to state a claim against Hershey and Benton upon which relief can be granted, and the Court must grant their Motion to Dismiss. (Document No. 30). The Amended Complaint fails to explain what Pennsylvania tort theory (or theories) entitles Goldhaber to relief, thereby requiring the Court to dismiss any and all claims arising under Pennsylvania law. Resolution of Judge George's Motion to Dismiss (Document No. 25) must await Goldhaber's filing of a more definite statement.

65

In order to facilitate the efficient and proper progress of this case, Goldhaber is advised that his more definite statement should specify not only the particular actions allegedly taken by Judge George, but also the *specific legal bases for relief against each particular defendant*. For this purpose, it would benefit him to set forth such legal bases in specific counts, and to avoid the incoherent generalizations which plague the Amended Complaint. Each defendant remains free to raise the appropriate immunity defenses at each stage of the litigation. *Behrens*, 516 U.S. at 309, 116 S.Ct. at 840, 133 L.Ed.2d at 785-786. An appropriate order follows.

## ORDER

**AND NOW**, this 28th day of September, 2007, this matter coming before the Court on the

Motion to Dismiss filed by Judge George (Document No. 25), the Motion to Dismiss filed by Higgins,

Clark, Bowser, Wypijewski and the Board (Document No. 28), and the Motion to Dismiss filed by

Hershey and Benton (Document No. 30), **IT IS HEREBY ORDERED** that the Motion to Dismiss filed

by Hershey and Benton is **GRANTED**, thereby rendering the Summary Judgment Motion (Document

No. 30) moot; that the Motion to Dismiss filed by Higgins, Clark, Bowser, Wypijewski and the Board

is **GRANTED** with respect to Goldhaber's Fourth Amendment, Eighth Amendment, procedural due

process and substantive due process claims and **DENIED** with respect to Goldhaber's Petition Clause

and Equal Protection Clause claims, and that Judge George's Motion to Dismiss is **DENIED**

**WITHOUT PREJUDICE**, pending the filing of a more definite statement by Goldhaber. The

Alternative Motion to Strike filed by Higgins, Clark, Bowser, Wypijewski and the Board (Document

No. 28) is **DENIED** as moot. Goldhaber is HEREBY ORDERED to file a more definite statement in

accordance with this opinion.

BY THE COURT:

**KIM R. GIBSON,**
**UNITED STATES DISTRICT JUDGE**

cc:     David M. Donaldson, Esq.
        Mary Lou Maierhofer, Esq.