IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DOUGLAS GOLDHABER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION NO. 3:06-134 |
| v. | ) | JUDGE KIM R. GIBSON |
| | ) | |
| WILLIAM HIGGINS, BRIAN CLARK, | ) | |
| KEITH BOWSER, MICHAEL GEORGE, | ) | |
| BEDFORD COUNTY PRISON BOARD, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER OF COURT

### I.  SYNOPSIS

This matter comes before the Court on Defendant George's Motion for Summary Judgment

(Doc. No. 93) and Defendants Higgins, Clark, Bowser, and Bedford County Prison Board's Motion for

Summary Judgment (Doc. No. 89) (collectively, the "Motions for Summary Judgment"). Plaintiff

opposes the Motions for Summary Judgment. Docs. 102, 103. For the reasons that follow, the

Motions for Summary Judgment are **GRANTED**.

### II.  PARTIES

Based on the pleadings, the parties in this case are as follows:

- Plaintiff Douglas Goldhaber, a criminal defense attorney practicing in
  Bedford County, Pennsylvania, who formerly served as Assistant Public
  Defender, and later as Chief Public Defender, of Bedford County;
- Defendant Bedford County Prison Board;
- Defendant Higgins, District Attorney of Bedford County, Pennsylvania,
  and a member of the Board of Bedford County Prison;
- Defendant Keith Bowser, the Chief Probation Officer of Bedford County
  and a member of the Board of Bedford County Prison;
- Defendant Brian Clark, the Warden of the Bedford County Prison and a
  member of the Board of Bedford County Prison;
- Defendant Michael George, a Judge of the Court of Common Pleas of
  Adams County, Pennsylvania and a member of the Adams County Prison

Board.

## III. PROCEDURAL BACKGROUND

This case arises from alleged retaliations on the part of Defendants against Plaintiff for the exercise of his constitutional rights. Plaintiff alleges violations of his First Amendment rights, as well as his rights under the Equal Protection Clause of the Fourteenth Amendment of the Constitution, as applicable via 42 U.S.C. § 1983. Doc. 42.

Each Defendant in this case seeks summary judgment.

On March 3, 2008, this Court entered its Order on various motions (Doc. 65), including motions to dismiss, ruling that:

- Defendant George's Motion to Dismiss (Doc. 50) was granted with respect to any claims relating to Plaintiff's continued incarceration after the expiration of his minimum sentence, and denied in all other respects;
- All state law claims against Defendants Higgins, Clark, Bowser, former Defendant Wypijewski and Defendant Bedford County Prison Board (the "Board") were dismissed for failure to state a viable claim under the law of Pennsylvania. Doc. 65 at 26.
- Paragraphs 10 through 14, and paragraph 20 of the Second Amended Complaint ("SAC") were stricken.

Among other findings, this Court ruled that it could not dismiss the claims against Defendant George on the basis of absolute immunity because the Plaintiff had sufficiently alleged, for purposes of a motion to dismiss, that Defendant George had committed acts of a nonjudicial nature; thus these facts, if proven to be true, would negate the affirmative defense of absolute immunity. Doc. 65 at 13. We noted that where both judicial and nonjudicial acts are alleged to have occurred, the two types of conduct must be separated, the former being eligible for, and the latter being ineligible for, absolute immunity. Id. We further noted that "while an adjudicatory officer engages in judicial conduct when he or she sentences an individual to prison, he or she engages in nonjudicial conduct if he or she harasses the individual during the subsequent period of incarceration." Doc. 65 at 15.

## IV.  JURISDICTION AND VENUE

The Court's jurisdiction has been invoked over Plaintiffs' federal claims pursuant to 42 U.S.C. § 1983, 28 U.S.C. § 1331 and 28 U.S.C. § 1343(a)(3)-(4). Venue is proper under 28 U.S.C. § 1391(b) because the majority of the parties, witnesses, and evidence are allegedly located in Bedford County, Western District of Pennsylvania, and the factual allegations at the heart of this complaint concern events occurring primarily in Bedford County in the Western District of Pennsylvania.

## V.  FACTS

This case involves alleged violations of Plaintiff's First Amendment rights, as well as his due process rights and Equal Protection rights under the Fourteenth Amendment, on the part of all named Defendants. Docs. 42, 102, 103. Plaintiff alleges that his First Amendment right to be free from retaliation for exercising his right to petition for a redress of grievances or pursuing a defense has been violated. Doc. 42 at 28-29. Plaintiff further alleges that the Bedford County Prison had an established policy, custom or practice aimed at intentionally depriving the Plaintiff of his First Amendment and Equal Protection rights, in violation of 42 U.S.C. § 1983. Doc. 42 at 4.

Plaintiff argues that Defendant George, a Judge of the Court of Common Pleas of Adams County, personally directed, in a nonjudicial capacity, that prison officials treat Plaintiff differently from other prisoners, and that therefore the affirmative defense of absolute immunity may not be invoked as to these actions by Defendant George. Doc. 42 at 1-2. Further, Plaintiff alleges that an objectively reasonable person in Defendant George's position would have been aware that his actions were illegal, therefore Defendant George is not entitled to qualified immunity. Doc. 102.

Plaintiff alleges that all Defendants conspired with each other to treat him differently from other defendants under the law, for vindictive personal reasons, in violation of the law. The alleged differences in treatment included, but were not limited to: placing him in solitary confinement;

3

refusing to allow him to meet with his attorney when she came to the jail; an agreement on the parts of Defendants Higgins, Clark, Bowser, and the Bedford County Prison Board to extend his period of incarceration past fifteen (15) days, contrary to the customary practice for defendants found guilty of similar charges; frequent transferring of the Defendant to different jails, and disallowing his housing in the Bedford County correctional facility, where he would likely have been eligible to participate in work release and would have been closer to his family; allowing him to receive only one fifteen (15) minute phone call per day; discarding a birthday card sent to him by his three-year-old daughter; and formulation of decisions regarding his incarceration on an *ex parte* basis. Plaintiff further contends that the influence exerted and the disparate treatment he received as an inmate constituted a custom and/or policy violating Plaintiff's rights under 42 U.S.C. § 1983. Docs. 42, 102, 103.

As we previously outlined in our Order on Defendants' Motions to Dismiss (Doc. 65), the facts of this case are as follows:

Plaintiff Goldhaber is a criminal defense attorney who maintains his practice in Bedford County, Pennsylvania. Doc. No. 42 at 7. His career includes previous service as the Public Defender for Bedford County. Id. At some point in late 1999 or early 2000, Defendant Higgins was hired as an Assistant District Attorney for Bedford County. Id. at 8. For several years thereafter, Goldhaber and Higgins frequently interacted with each other, and their relationship was congenial, which Plaintiff Goldhaber alleges led Defendant Higgins to let down his guard and admit to Goldhaber certain alleged morally and/or legally improper acts that he had committed or was in the process of committing. Id. at 9-14. In November 2003, Higgins was elected to be the District Attorney for Bedford County. Id. at 15. Shortly thereafter, the relationship between Goldhaber and Higgins deteriorated, and animosity developed. Goldhaber speculates that this ill will was the result of: 1) Goldhaber's drawing of the court's attention to certain unprofessional behavior allegedly committed by Higgins during court

4

recesses on several occasions; as well as 2) a resentment and fear on Higgins' part over Goldhaber's knowledge of the aforementioned larger acts of impropriety which Higgins had allegedly divulged during the period in which the two were on friendly terms. Id. at 16-24.

On April 9, 2004, Goldhaber was arrested for driving under the influence of alcohol.[1] Id. at 6. Because a conflict of interest precluded the Bedford County District Attorney's Office from being involved with the case, the Pennsylvania Attorney General's Office prosecuted Goldhaber. Id. at 25. At a preliminary hearing held July 19, 2004, the charges against Goldhaber were permitted to proceed. Id. at 26. On August 6, 2004, Judge Daniel Lee Howsare, the President Judge of the Pennsylvania Court of Common Pleas of Bedford County, recused himself from participating in Goldhaber's case. Id. at 27. Judge Kevin A. Hess, of the Pennsylvania Court of Common Pleas of Cumberland County, was appointed to preside over the case, however, Judge Howsare subsequently entered an order appointing Defendant Judge George, of the Pennsylvania Court of Common Pleas of Adams County, to the case on January 25, 2005.

According to the SAC, Defendant Higgins attempted to testify at Goldhaber's trial, but was not permitted to do so. Doc. 42 at 12. On March 2, 2005, after a jury trial, Goldhaber was convicted of Driving After Imbibing, and was subsequently sentenced by Defendant Judge George to a term of incarceration of no less than ninety days and not more than one day less than five years at the Bedford County Correctional Institution. Id. at 12; Doc. 95 at 1. According to the terms of the sentence,

---

[1] Specifically, Plaintiff Goldhaber was charged under Chapter 38 of Pennsylvania's Motor Vehicle Code, entitled "Driving After Imbibing Alcohol or Utilizing Drugs." The applicable provision provides that:
   (1) An individual may not drive, operate or be in actual physical control of the movement of a vehicle after imbibing a sufficient amount of alcohol such that the individual is rendered incapable of safely driving, operating or being in actual physical control of the movement of the vehicle.
   (2) An individual may not drive, operate or be in actual physical control of the movement of a vehicle after imbibing a sufficient amount of alcohol such that the alcohol concentration in the individual's blood or breath is at least 0.08% but less than 0.10% within two hours after the individual has driven, operated or been in actual physical control of the movement of the vehicle.
75 Pa.C.S. § 3802.

5

Goldhaber was eligible for work release. Id.

On August 5, 2005, Judge George revoked Goldhaber's bail because Goldhaber's attorney failed to file an appeal (the customary discretionary courtesy/practice for that type of conviction being release on bail pending appeal, as it is generally assumed that Defendants will appeal. Since Goldhaber did not appeal by the deadline, he would therefore be expected to begin serving his sentence once the deadline for his appeal had passed). Id. at 13. Judge George's order required Goldhaber to surrender himself to the Bedford County Correctional Institution by 6:00 p.m. on August 9, 2005, however Goldhaber claims he did not learn of this order until the late afternoon hours of August 8, 2005. Id. Plaintiff Goldhaber alleges that Defendant Higgins, despite being conflicted out of the case, "tried to personally file [the order] in the Clerk of Court's Office for Bedford County", and directed troopers with the Pennsylvania State Police ("PSP") to take Goldhaber into custody before the scheduled surrender deadline of 6:00 p.m. August 9, 2005. Id. at 12-13. Plaintiff Goldhaber also alleges that Defendant Higgins contacted the Bedford Gazette in order to request that a photographer be present when Goldhaber surrendered himself. Id. at 13.

Plaintiff Goldhaber alleges that at the time that he reported to the Bedford County Correctional Institution on August 9, 2005, Defendants Higgins, Clark, Bowser and the Board had already made the decision to house him outside of Bedford County (at the time, Clark was the Warden of the Bedford County Correctional Institution, and Bowser was Bedford County's Chief Probation Officer). Id. at 13. When Goldhaber arrived at the Bedford County Correctional Institution, he was immediately transported to the Clinton County Correctional Facility, where he was housed on a maximum security federal block. Id. at 37. Defendants George and Clark explain that this decision was made for several reasons, chief among them were concerns about the ability of the Bedford County prison to ensure Plaintiff's safety, as he had represented several inmates that were housed in that facility in their

6

criminal cases. Added to this was the fact that the Bedford County facility was very close to full capacity, and Sheriff's Deputies had brought to Defendant Clark's attention threats by inmates which had been directed towards Plaintiff Goldhaber. Doc. 92-12; Doc. 92-20; Doc. 95.

Goldhaber's attorney subsequently filed a petition seeking the reinstatement of Goldhaber's bail and appellate rights, and requesting Goldhaber's return to Bedford County. Id. at 40. In an order dated August 11, 2005, Judge George stated that the Court of Common Pleas lacked jurisdiction to extend the limitations period for the filing of an appeal, that the Court of Common Pleas lacked the authority to direct a warden of a county prison to house a particular inmate at a specific facility and that "rational security concerns" articulated by Clark had provided a reasonable basis for the decision to house Goldhaber outside of Bedford County. Id. at 14. Judge George's order indicated that Goldhaber was eligible for work release subject to "the rules and regulations of the facility in which he [was] incarcerated." Id. at 15.

Clark subsequently agreed to have Goldhaber returned to the Bedford County Correctional Institution if he was willing to sign a liability waiver that would protect the Institution from liability should Plaintiff be injured during his incarceration. Id. at 45. Nevertheless, Plaintiff alleges that Clark arbitrarily indicated that he had "changed his mind" after learning that Goldhaber would be eligible for work release and that the Board, which counted both Higgins and Clark as members, was allegedly complicit in Clark's actions. Id. at 16. Plaintiff attempts to support his allegations that Defendant Clark was a driving force in the conspiracy by stating that Bedford County Commissioner Steven Howsare, Chairman of the Board, told Goldhaber's wife that he knew nothing about how to run a prison, and that such matters were left to the discretion of Clark. Id. at 17.

According to the SAC, Goldhaber initiated an attempt to be moved to Cambria County prison, which was sufficiently close to Bedford County, and thus Plaintiff's law practice as it existed at the

7

time of his incarceration, to enable Goldhaber to get the maximum benefit from the work release program. Id. at 17. Plaintiff alleges that Defendant Clark demanded and received money from Plaintiff's wife in payment for alleged costs of transporting Plaintiff, and on September 1, 2005, Plaintiff was transported from Clinton County to the Cambria County Prison. Id. at 17-18.

Plaintiff alleges that shortly thereafter, on September 13, 2005, he was transferred to the Bedford County Jail pursuant to a collusion and conspiracy by and between Defendants Higgins, Clark, George, Bowser and the Board.

Shortly after arriving in Cambria County, Goldhaber petitioned the Pennsylvania Court of Common Pleas of Cambria County for release to house arrest in order to facilitate his participation in the work release program. Doc. 28, pp. 16-17. Although Judge George's sentence of March 2, 2005 had permitted for the possibility of work release, it did not allow for house arrest. Id.; Doc. 92. On September 9, 2005, Judge Gerard Long granted Goldhaber's request for release to house arrest, apparently not realizing that the March 2, 2005 Order did not allow for house arrest. Doc. 28 at 19. As stated supra, four days after this grant by Judge Long, Plaintiff alleges that Defendants had him removed from the Cambria County Prison. Doc. No. 42 at 18. Defendant Clark explains that on or about September 13, 2005, personnel at Cambria County prison had notified him that Plaintiff was about to be released on house arrest, per Judge Long's orders. Doc. 92-20 at 4. Defendant Clark further explains that he contacted Defendant Judge George because Defendant Clark was aware that Plaintiff's sentence did not permit house arrest. Id. Defendant Clark attests that Defendant George instructed that Plaintiff be returned back to Bedford County prison so that Judge George's sentencing order would be enforced. Id.

On September 14, 2005, Judge Long vacated his order permitting Goldhaber to be released under house arrest, and issued a new order granting work release only. Doc. No. 28, p. 20.

After arriving at the Bedford County Correctional Institution, Plaintiff alleges that he had a conversation with Defendant Clark, during which Defendant Clark allegedly informed Plaintiff that Plaintiff would be kept in solitary confinement for an indefinite period of time. Doc. No. 42 at 18-19. Clark further stated that he had never agreed to any form of work release or house arrest, and that Goldhaber would be shipped to a state correctional facility if he were to voice complaints about his housing arrangement. Id. According to the SAC, Defendant Higgins subsequently gave statements to the media indicating that Defendant George had been responsible for having Plaintiff moved to Bedford County. Id. at 19. Plaintiff alleges that his unusual treatment while incarcerated was the result of a conspiracy between Defendants George, Higgins, Clark and Bowser to effectively deny Goldhaber a meaningful opportunity to participate in the work release program. Id. at 19.

At some later point, Goldhaber was moved from the Bedford County Correctional Institution to the Adams County Adult Correctional Complex, which is located in Gettysburg, Pennsylvania. Id. at 19. Defendants George and Clark again cite security issues and concerns regarding Plaintiff's safety as the primary motivating reasons for this move. Doc. 92-20; Doc. 95. Judge George and Clark were familiar with each other because Clark had previously worked as an officer at the Adams County Adult Correctional Complex. Id. Goldhaber avers that Judge George, who is a Board Member of the Adams County prison, orchestrated his move to Adams County in order to retaliate against Goldhaber for filing a lawful petition in the Court of Common Pleas of Cambria County. Id. at 20. Because of the distance between Adams County and Bedford County, Plaintiff asserts that he was essentially precluded from participating in a work release program. Id. at 20. Plaintiff also alleges that Defendant Judge George instructed the officials at the Adams County Adult Correctional Complex to seek his personal approval before permitting Goldhaber to see his attorney or other visitors. Id. at 20-21. Higgins and Clark allegedly gave statements to the media indicating that Judge George had played a

9

role in deciding where Goldhaber would be housed. Id. at 21-22. Plaintiff alleges that since Bedford County was responsible for the cost of housing Goldhaber in these different facilities, the Board was fully aware of the fact that Goldhaber had been repeatedly moved from one prison to another. Id. at 20. Further, Plaintiff alleges that all of the communications between Judge George, Higgins, Clark, Bowser and the Board were conducted on an *ex parte* basis. Id. at 22.

Among other allegations, Plaintiff alleges that former Defendant Wypijewski, as the deputy warden at the Adams County Adult Correctional Complex and under the direction of or in collusion with the other Defendants, placed Goldhaber into solitary confinement, which was unusual for an inmate with that type of conviction. Id. at 23. Further, Plaintiff alleges that Defendant George, in collusion with former Defendant Wypijewski, prohibited Plaintiff from speaking with his attorney. Id. at 23-24. Plaintiff also alleges that his officially filed grievances were ignored,[2] and a birthday card from his three-year-old daughter was confiscated as an alleged security threat. Id. at 24.

Plaintiff further alleges that Defendant Bowser deliberately delayed the processing of Plaintiff's release papers, thereby causing Goldhaber to remain incarcerated for an additional fifteen days past the standard minimum fifteen days for that type of offense. Id. at 25-26. Plaintiff also alleges that Defendant George sent Goldhaber's wife a threatening letter after she had requested transcripts of his trial for his attorney's use. Id. at 27.

Goldhaber contends that all of these actions of the Defendants were retaliatory in nature, and were the result of a conspiracy against him by Defendants, in violation of both the Petition Clause of the First Amendment (which applies to state actors by virtue of the Due Process Clause of the Fourteenth Amendment) and due process protections under the Equal Protection Clause of the

---

[2] The only example of this assertion which is provided by Plaintiff is the alleged removal of a Saint Christopher's medallion from his person during his incarceration.

Fourteenth Amendment. Doc. 42; Doc. 103 at 13; Doc. 102. He brings his claims pursuant to 42 U.S.C. § 1983.

## VI.  STANDARD OF REVIEW

### A. SUMMARY JUDGMENT

Summary judgment may only be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits, show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(c)*. An issue is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986); see *McGreevy v. Stroup*, 413 F.3d 359, 363 (3d Cir. 2005); citing *Debiec v. Caot Corp.*, 352 F.3d 117, 128 n. 3 (3d Cir. 2003). A factual dispute is "material" if it might affect the outcome of the case under governing law. *Id.* Pursuant to Federal Rule of Civil Procedure 56(c), summary judgment against a party is appropriate where that party fails to make a sufficient showing of an element for which that party will bear the burden of proof at trial, and which is an essential element of that party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In evaluating the evidence, the Court must interpret the facts in the light most favorable to the non-moving party, drawing all reasonable inferences in his or her favor. *Watson v. Abington Township*, 478 F.3d 144, 147 (3d Cir. 2007); see also *Troy Chemical Corp. v. Teamsters Union Local No. 408*, 37 F.3d 123, 126 (3d Cir. 1994); citing *Oritani Sav. And Loan Ass'n v. Fidelity and Deposit Co.*, 989 F.2d 635, 637 (3d Cir. 1993). The burden is initially on the moving party to demonstrate that the evidence contained in the record does *not* create a genuine issue of material fact. *Conoshenti v. Public Service Electric & Gas Co.*, 364 F.3d 135, 140 (3d Cir. 2004). See also *Troy Chemical Corp. v. Teamsters Union Local No. 408*, 37 F.3d 123, 125-126 (3d Cir. 1994); citing *Celotex Corp. v. Catreett*, 477 U.S. 317, 322-32

11

(1986). Where the non-moving party will bear the burden of proof at trial as to some element or claim, the moving party may meet its initial burden as to issues of material fact by showing that the admissible evidence contained in the record would be insufficient to carry the non-moving party's burden of proof. *Celotex*, 477 U.S. at 322.

Once the moving party satisfies its burden that the record contains no genuine issue of material fact, the burden shifts to the non-moving party, who must go beyond his or her pleadings by the use of affidavits, depositions, admissions or answers to interrogatories, in order to demonstrate that there *is* a genuine issue of material fact for trial. *Id.* at 324. In attempting to do so, the non-moving party cannot defeat a well-supported motion for summary judgment by simply reasserting unsupported factual allegations contained in his or her pleadings. *Williams v. Borough of West Chester*, 891 F.2d 458, 460 (3d Cir. 1989).

### B. CIVIL LIABILITY UNDER 42 U.S.C. § 1983

The instant claim is brought pursuant to 42 U.S.C. § 1983, which "imposes civil liability upon any person who, acting under the color of state law, deprives another individual of any rights, privileges, or immunities secured by the Constitution of the United States." *Jarrett v. Twp. of Bensalem*, 312 Fed. Appx. 505, 507 (3d Cir. 2009); citing *Gruenke v. Seip*, 225 F.3d 290, 298 (3d Cir. 2000).

As the Third Circuit has explained,

§ 1983 is not a source of substantive rights, but provides a remedy against state officials for violations of constitutional rights. [*internal citations omitted*]. The initial inquiry in a section 1983 suit is (1) whether the conduct complained of was committed by a person acting under color of state law and (2) whether the conduct deprived the complainant of rights secured under the Constitution or federal law.

*Sameric Corp. v. City of Philadelphia*, 142 F.3d 582, 590 (3d Cir. Pa. 1998); citing *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 816, 105 S. Ct. 2427, 2432, 85 L. Ed. 2d 791 (1985) (plurality opinion);

*also* *citing* *Baker v. McCollan*, 443 U.S. 137, 144 n.3, 99 S. Ct. 2689, 2694-95 n.3, 61 L. Ed. 2d 433

(1979); *also* *citing* *West v. Atkins*, 487 U.S. 42, 48, 108 S. Ct. 2250, 2254-55, 101 L. Ed. 2d 40 (1988);

*also* *citing* *Mark v. Borough of Hatboro*, 51 F.3d 1137, 1141 (3d Cir. 1995); *see also Jarrett v. Twp. of*

*Bensalem*, 312 Fed. Appx. 505, 507 (3d Cir. 2009).

A local governmental entity may only be sued under § 1983 for an action which represents

official policy or custom that caused a deprivation of a plaintiff's constitutional rights. The Supreme

Court of the United States has held that "a local government may not be sued under § 1983 for an

injury inflicted solely by its employees or agents. Instead, it is when execution of a government's

policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to

represent official policy, inflicts the injury that the government as an entity is responsible under §

1983." *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694, 98 S.Ct. 2018, 2037-38,

56 L. Ed. 2d 611 (1978); *cited* *and* *quoted* *by* *Bayer v. Monroe County Children & Youth Servs.*, 2011

U.S. App. LEXIS 2550 (3d Cir. 2011); *see* *also* *Doby v. DeCrescenzo*, 171 F.3d 858, 867 (3d Cir.

1999).

The Third Circuit has explained how a plaintiff may show custom and/or policy:

> a plaintiff can show a local government's custom and/or policy in the
> following manner: Policy is made when a decisionmaker possessing . . .
> final authority to establish municipal policy with respect to the action
> issues an official proclamation, policy, or edict. Custom, on the other
> hand, can be proven by showing that a given course of conduct, although
> not specifically endorsed or authorized by law, is so well-settled and
> permanent as virtually to constitute law.
>
> In either instance, a plaintiff must show that an official who has the power
> to make policy is responsible for either the affirmative proclamation of a
> policy or acquiescence in a well-settled custom.

*Bayer v. Monroe County Children & Youth Servs.*, 2011 U.S. App. LEXIS 2550, 12-13 (3d Cir.

2011); *quoting* *Bielevicz v. Dubinon*, 915 F.2d 845, 850 (3d Cir. 1990).

## A. RESPONDEAT SUPERIOR

The Third Circuit has held that "[i]t is well-established . . . that liability in a § 1983 action must be predicated upon personal involvement, not on the basis of *respondeat superior*. *Brown v. Daniels, et. al.*, 128 Fed. Appx. 910, 913 (3d Cir. 2005). Similarly, in order to establish liability on the part of the Bedford County Prison Board, the Plaintiffs would have to demonstrate "an established policy or custom that resulted in the alleged constitutional violations." *Id.*; citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690-91, 56 L.Ed., 2d 611, 98 S. Ct. 2018 (1978).

## B. DUE PROCESS – LEGAL STANDARDS

The Fourteenth Amendment to the U.S. Constitution states, in relevant part, "nor shall any State deprive any person of life, liberty, or property, without due process of law." USCS Const. Amend. 14; see also *Gardner v. McGroarty*, 68 Fed. Appx. 307, 310, 2003 U.S. App. LEXIS 11452 (3d Cir. 2003). The Supreme Court has held that this refers not only to the adequacy of due process procedures, but also to substantive law. *Nicholas v. Pennsylvania State University, et al.*, 227 F.3d 133, 139 (3d Cir. 2000); citing *Planned Parenthood of S.E. Pennsylvania v. Casey*, 505 U.S. 833, 846-47, 120 L. Ed. 2d 674, 112 S. Ct. 2791 (1992); also citing *Witney v. California*, 274 U.S. 357, 373, 71 L. Ed. 1095, 47 S. Ct. 641 (1927). Indeed, the Third Circuit has noted that "a non-legislative government deprivation 'that comports with procedural due process may still give rise to a substantive due process claim 'upon allegations that the government deliberately and arbitrarily abused its power.'"" *Nicholas v. Pennsylvania State University* at 139 (citations omitted).

As we have previously stated, "[n]on-legislative, *substantive* due process rights are those rights that are 'fundamental under the Constitution'". (*emphasis added*). *Jendrzejewski v. Watson et al.*, 2009 U.S. Dist. LEXIS 24352 at *11 (W.D. Pa. 2009); citing *Nicholas*, supra.

In contrast, it is well settled that *procedural* due process rights under the Fourteenth

14

Amendment apply only to deprivations of "[p]roperty interests . . . [which] are created and their dimensions are defined . . . from an independent source such as state law." See *Board of Regents v. Roth*, 408 U.S. 564, 577, 33 L. Ed. 2d 548, 92 S. Ct. 2701 (1972); cited by *Clark v. Falls*, 890 F.2d 611, 617 (3d Cir. 1989); also cited by *Blanding v. Pennsylvania State Police et al.*, 811 F. Supp. 1084, 1091 (E.D. Pa. 1992), aff'd 12 F.3d 1303 (3d Cir. Pa. 1993); see also *Cleveland Board of Educ. v. Loudermill*, 470 U.S. 532, 538, 84 L. Ed. 2d 494, 105 S. Ct. 1487 (1985); see also *Demko v. Luzerne County Community College*, 113 F. Supp. 2d 722, 728 (M.D. PA. 2000); see also *Cohen v. Board of Trustees*, 867 F.2d 1455, 1462 (3d Cir. 1989) ("[P]rocedural due process claims . . . refer to a source of positive law which creates the protected property interest.").

### C. QUALIFIED AND ABSOLUTE IMMUNITY
#### i. Absolute Immunity

Government officials/state actors may assert an affirmative defense of absolute or qualified immunity. The Supreme Court has noted that "[t]he procedural difference between the absolute and the qualified immunities is important. An absolute immunity defeats a suit at the outset, so long as the official's actions were within the scope of the immunity. The fate of an official with qualified immunity depends upon the circumstances and motivations of his actions, as established by the evidence at trial." *Imbler v. Pachtman*, 424 U.S. 409, 419 (U.S. 1976).

In the instant case, Defendant George claims absolute immunity due to his status as a judge.

The Third Circuit has held that, in considering an absolute immunity defense,

[w]e must engage in a two-part inquiry to determine whether judicial immunity is applicable. 'First, a judge is not immune from liability for nonjudicial actions, *i.e.*, actions not taken in the judge's judicial capacity.' [*internal citations omitted*]. 'Second, a judge is not immune for actions, though judicial in nature, taken in the complete absence of all jurisdiction.' [*internal citations omitted*]. With respect to the first inquiry, 'the factors determining whether an act by a judge is a 'judicial' one relate to the nature of the act itself, *i.e.*, whether it is a function normally performed by a judge, and to the expectations of the parties, *i.e.*, whether they dealt with the judge in his judicial capacity.'

[*internal citations omitted*]. Our task is to 'draw the line between truly judicial acts, for which immunity is appropriate, and acts that simply happen to have been done by judges,' such as administrative acts. [*internal citations omitted*].

With respect to the second inquiry, we must distinguish between acts in the 'clear absence of all jurisdiction,' which do not enjoy the protection of absolute immunity, and acts that are merely in 'excess of jurisdiction, 'which do enjoy that protection: A distinction must be here observed between excess of jurisdiction and the clear absence of all jurisdiction over the subject-matter. Where there is clearly no jurisdiction over the subject-matter any authority exercised is a usurped authority, and for the exercise of such authority, when the want of jurisdiction is known to the judge, no excuse is permissible. But where jurisdiction over the subject-matter is invested by law in the judge, or in the court which he holds, the manner and extent in which the jurisdiction shall be exercised are generally as much questions for his determination as any other questions involved in the case, although upon the correctness of his determination in these particulars the validity of his judgments may depend. [*internal citations omitted*].

'A judge will not be deprived of immunity because the action he took was in error, was done maliciously, or was in excess of his authority; rather, he will be subject to liability only when he has acted in the 'clear absence of all jurisdiction.' [*internal citations omitted*].

*Gallas v. Supreme Court*, 211 F.3d 760, 768-769 (3d Cir. 2000); citing and quoting *Mireles v. Waco*, 502 U.S. 9, 112 S. Ct. 286, 288, 116 L. Ed. 2d 9 (1991); also citing *Stump v. Sparkman*, 435 U.S. 349, 355-56, 98 S. Ct. 1099, 1104-1105, 55 L. Ed. 2d 331 (1978); also citing Forrester v. White, 484 U.S. 219, 225-27, 108 S. Ct. 538, 543-44, 98 L. Ed. 2d 555 (1988).

Previously, we ruled that Plaintiff's complaint did not sufficiently allege nonjudicial actions on the part of Defendant George, and gave leave for Plaintiff to refile his claim against Defendant George if he was able to make more developed allegations of nonjudicial conduct by Defendant George. Doc. 65.

### ii. Qualified Immunity

In contrast, qualified immunity must be analyzed in light of the circumstances of the case. The Supreme Court has explained the doctrine of qualified immunity as follows:

> The doctrine of qualified immunity protects government officials 'from

16

liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' [*internal citations omitted*]. Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably. The protection of qualified immunity applies regardless of whether the government official's error is 'a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.'

*Pearson v. Callahan*, 555 U.S. 223; 129 S. Ct. 808, 815; 172 L. Ed. 2d 565, 573 (U.S. 2009); citing and quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982); also citing and quoting *Groh v. Ramirez*, 540 U.S. 551, 567, 124 S. Ct. 1284, 157 L. Ed. 2d 1068 (2004) (Kennedy, J., dissenting); in turn citing *Butz v. Economou*, 438 U.S. 478, 507, 98 S. Ct. 2894, 57 L. Ed. 2d 895 (1978) (noting that qualified immunity covers "mere mistakes in judgment, whether the mistake is one of fact or one of law").

The Supreme Court has noted that while the subjective intent of a defendant's actions may be an essential element of the pleading of certain constitutional federal *claims*, it is irrelevant in analyzing an affirmative qualified immunity *defense*; qualified immunity is an affirmative defense which is separate from a cause of action. *Crawford-el v. Britton*, 523 U.S. 574, 588; 118 S. Ct. 1584, 1591-92; 140 L. Ed. 2d 759, 773-74 (1998).

As we have previously outlined, the Third Circuit has explained qualified immunity as follows:

A right is 'clearly established' for qualified immunity purposes only if 'the contours of the right' are 'sufficiently clear that a reasonable official would understand that what he is doing violates that right.' Thus, defendants are entitled to qualified immunity if 'reasonable officials in [their] position at the relevant time could have believed, in light of what was in the decided case law, that their conduct would be lawful.' Even where officials 'clearly should have been aware of the governing legal principles, they are nevertheless entitled to immunity if based on the information available to them they could have believed their conduct would be consistent with those principles.'

17

> However, for reasonable officials to be on notice that their conduct would
> be unlawful, there need not be 'a previous precedent directly on point.'
> Rather, there need only be 'some but not precise factual correspondence
> between relevant precedents and the conduct at issue,' so that 'in the light
> of pre-existing law the unlawfulness [would be] apparent.'

*Bowser v. Blair County Children and Youth Services, et. al.*, 346 F. Supp. 2d 788, 795 (W.D. Pa. 2004); quoting *Larsen v. Senate of Com. of Pa.*, 154 F.3d 82, 87 (3d Cir. 1998).

Indeed, the Supreme Court has held that a qualified immunity defense may not be overcome by "bare allegations of malice" and that "government officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. . . . By defining the limits of qualified immunity essentially in objective terms, we provide no license to lawless conduct. The public interest in deterrence of unlawful conduct and in compensation of victims remains protected by a test that focuses on the objective legal reasonableness of an official's acts." *Harlow et al. v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738-29, 73 L. Ed. 2d 396, 410-11 (1982).

The Third Circuit has explained that to generate liability an official's act must be "so ill-conceived or malicious that it 'shocks the conscience.' . . . Critically, under this standard, officials will not be held liable for actions that are merely negligent." *Miller et. al. v. City of Philadelphia et. al*, 174 F.3d 368, 375 (3d Cir. 1999). This is a fact-specific inquiry: "The exact degree of wrongfulness necessary to reach the 'conscience-shocking' level depends upon the circumstances of a particular case." *Miller et. al. v. City of Philadelphia et. al.*, 174 F.3d 368, 375 (3d Cir. 1999); see also *Brown v. Daniels et. al.*,128 Fed. Appx. 910 (3d Cir. 2005).

Thus, in considering a defense of qualified immunity, the Court must first consider whether a constitutional right was violated, and next if the right was clearly established when the alleged

violation occurred. *Bowser* at 800; <u>citing</u> *Conn. v. Gabbert*, 526 U.S. 286, 290, 119 S. Ct. 1292, 1295, 143 L. Ed. 2d 399 (1999).

## VII.   DISCUSSION/ARGUMENTS

Plaintiff argues that Defendants are not entitled to summary judgment because there *are* disputes about significant and genuine issues of material fact. Doc. 102 at 10; Doc. 103.

Defendant George argues that he is entitled to absolute immunity. Doc. 49 at 2. Doc. 62 at 13-22; Doc. 94. Further, all of the Defendants believe that they are entitled to qualified immunity, and argue that they acted in an objectively reasonable manner, believing their actions to be lawful, and therefore are entitled to qualified immunity. Doc. 89 at 2; Doc. 94; Doc. 89; Doc. 90. Plaintiff argues that the conduct of Defendants was objectively unreasonable in light of clearly established legal rules. Doc. 103 at 22-23.

Absolute and qualified immunity are affirmative defenses. *Crawford-el v. Britton*, 523 U.S. 574, 588; 118 S. Ct. 1584, 1591; 140 L. Ed. 2d 759, 773 (1998). Previously, in our Order on Defendants' Motions to Dismiss, we found that Defendant George was not entitled to dismissal by virtue of the affirmative defense of absolute immunity, as Plaintiff had alleged that several of Defendant George's actions were nonjudicial in nature. Doc. 65. Plaintiff Goldhaber continues to argue that absolute immunity does not apply to Defendant George due to the extra-judicial nature of his alleged actions. Further, Plaintiff objects to summary judgment in favor of Defendant George based on the affirmative defense of qualified immunity because, he argues, "[a]ny objectively reasonable person in Defendant George's position would know that exparte [*sic*] and out of court communication, involvement and participation in a criminal case is a violation of established constitutional principles and rights." Doc. 102 at 11.

Similarly, he argues that the other Defendants acted in a manner which an objectively

reasonable person in their position would have known was unlawful, and therefore none of the Defendants is entitled to qualified immunity. Doc. 103. Defendant George counters that reasonable minds could differ as to the state of the law at the time of the alleged conduct, or whether or not the conduct was lawful, therefore he is entitled to qualified immunity. Doc. 94 at 5-6.

Defendant George further argues that Plaintiff will not be able to sustain a claim for retaliation under § 1983 because he will be unable to demonstrate that he was retaliated against for exercising his constitutionally protected conduct, suffered an adverse action which would deter a person of ordinary firmness from exercising his constitutional rights, and that there was no causal link between the exercise of these constitutional rights and the actions taken against him. Doc. 94. Defendant George argues that Plaintiff's allegations that Defendant George instructed Adams County prison officials to seek his approval before admitting visitors to see Plaintiff can not constitute constitutional retaliation; Defendant George reasons that this is so because words, even if they are of a threatening or offensive manner, do not constitute retaliation. Doc. 94 at 4. Defendant George cites *Burgos v. Canino* in support of this argument; however, this argument takes *Burgos* out of context and misconstrues Plaintiff's allegations. In *Burgos*, the Third Circuit found that a guard's verbal threat of possible disciplinary action should the prisoner/Plaintiff refuse to comply with a urinalysis test[3] did not amount to retaliatory action; this was especially true, the Third Circuit found, in light of the fact that the guard did not take any disciplinary measures. *Burgos v. Canino, et al.*, 641 F. Supp. 2d 443 (3d Cir. 2009). Plaintiff is not alleging vague threats, but rather is alleging that Defendant George used his influence to limit Plaintiff's visitors and cause other disparate treatment of Plaintiff; while Defendant George may have exercised this alleged influence and control through words, among other methods, this does not

---

[3] The test was being conducted, pursuant to procedure, on all prisoners in the plaintiff's cell block due to the smell of marijuana.

mean that any action resulting from those words is immune from a suit of retaliation. Plaintiff is not alleging that the act of retaliation committed by Defendant George's was a verbal threat; *Burgos* is inapposite to the instant case.

Defendant Higgins also argues that although this Court has previously ruled that Plaintiff engaged in Constitutionally-protected conduct, the claim has not adequately identified any retaliatory conduct on the part of Defendant Higgins. Doc. 90. In the same document, all Defendants (save George, who is represented separately) argue that no constitutional right has been violated, therefore summary judgment must be granted in favor of Defendants. Doc. 90 at 14 ("The only rights at issue are with respect to the First Amendment Petition Clause and the Equal Protection Clause of the Fourteenth Amendment. Neither claim withstands judicial scrutiny based on the record evidence. . . . In that no right was violated, it can hardly be contended that any of the defendants were aware or should have been aware that any of their conduct violated such right.").

In addition, the Bedford County Prison Board argues that the claim must be dismissed as to Plaintiff's Equal Protection Claim because Plaintiff has not demonstrated that he was treated differently from others similarly situated, or that his treatment was irrational or arbitrary. Doc. 80 at 9-12. Further, Defendant Bedford County Prison Board argues that Plaintiff's claim related to the decision to house him outside of Bedford County is barred by the Rooker-Feldman Doctrine because this Court does not have "'subject matter jurisdiction to engage in appellate review of state court determinations or to evaluate constitutional claims that are 'inextricably intertwined with the state court's [decision] in a judicial proceeding.'' . . . Because the plaintiff previously sought to have the decision to house him outside of Bedford County reversed and such effort was denied by the trial court, he is barred from attempting to re-litigate it in this civil rights claim." Doc. 90 at 11.

The Third Circuit has noted that

the Supreme Court confined the application of the Rooker-Feldman doctrine to "cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." [*internal citations omitted*]. Accordingly, for the doctrine to apply, four requirements must be met: "(1) the federal plaintiff lost in state court; (2) the plaintiff 'complain[s] of injuries caused by [the] state-court judgments'; (3) those judgments were rendered before the federal suit was filed; and (4) the plaintiff is inviting the district court to review and reject the state judgments." [*internal citations omitted*].

*Middlebrook at Monmouth v. Liban*, 2011 U.S. App. LEXIS 5938 (3d Cir. 2011); citing *In Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284, 125 S. Ct. 1517, 161 L. Ed. 2d 454 (2005); also citing *Great Western Mining & Mineral Co. v. Fox Rothschild LLP*, 615 F.3d 159, 166 (3d Cir. 2010). However, where the Plaintiff is alleging that he was injured by the Plaintiffs, and not the state court judgment, the Rooker-Feldman doctrine does not apply. See *Kliesh v. Select Portfolio Servicing Inc.*, 2011 U.S. App. LEXIS 5897, 4-5 (3d Cir. 2011) ("According to [Plaintiff], he alleged that he was injured by the defendants, not the state-court judgment. So construed, we agree that the claim is arguably not barred by the Rooker-Feldman doctrine.").

Based on the evidence before this Court, it appears that the Plaintiff is not challenging an unfavorable decision by a state court, but rather is making a constitutional challenge to his treatment as a state prisoner. We do not read his complaint to indicate any sort of challenge to his Driving After Imbibing conviction. Therefore, the Rooker-Feldman doctrine does not apply, as this case is not challenging the outcome of a state court judgment. At the very least, the record is not sufficiently developed to support summary judgment on this basis.[4]

Defendant Bedford County Prison Board further argues that Plaintiff has failed to establish the existence of a policy or custom, for which the Board was responsible, that caused the deprivation of Plaintiff's constitutional rights, and additionally that it cannot be held liable under a theory of

---

[4] Defendants' argument on the applicability of this doctrine is confined to one paragraph and not very well developed.

*respondeat superior.* Doc. 90 at 12-13; Doc. 89 at 2. Plaintiff responds that Defendant Bedford County Prison Board, of which Defendants Higgins, Bowser and Clark are members, maintained a policy and/or custom which caused the deprivation of Plaintiff's constitutional rights, and that this was done "knowingly", "willingly", and "intentionally" on the part of Defendants Higgins, Bowser, Clark and the Board. Doc. 103 at 21-22.

We find that Plaintiff has <u>not</u> established the existence of a policy or custom which led to the deprivation of his constitutional rights. Plaintiff pleads a policy or custom as a conclusion but has failed to set forth any facts upon which such a claim could be established. We note that Defendants Higgins, Clark, Bowser and the Bedford County Prison Board have supplied this Court with an alternate rationale as to why Plaintiff was not housed in Bedford County facilities, that of safety concerns. The record shows that Defendant Clark recorded his concerns about potential danger to the Plaintiff resulting from Plaintiff's former representation of several inmates in the Bedford County facility. Doc. 91. However, Plaintiff disputes this explanation, arguing that the true motivating factor was retaliation. Doc. 102, 103.

We find that, even when all of the facts are viewed in the light most favorable to the Plaintiff, the Plaintiff has not stated a claim upon which relief may be granted. Plaintiff has asserted bare legal conclusions in his arguments that he was retaliated against for exercise of his constitutional rights and that Defendants were responsible for a policy and/or custom which caused a violation of his constitutional rights, however even the barest of facts to support these claims are lacking.

Further, when we consider the material facts as stated, in the light most favorable to the Plaintiff/nonmovant, we find that Defendant George has carried the burden for establishing his entitlement to the affirmative defenses of both absolute and qualified immunity. There is no relevant evidence, but rather only bare allegations on the part of the Plaintiff, to support the contention that

23

Defendant Judge George directed Adams County Correctional Institution to clear all visitors to Plaintiff with Defendant George before admitting them, let alone that he directed prison officials to refuse Plaintiff access to his attorney.[5]  Plaintiff has failed to establish that there is a dispute of material fact on this issue.

Similarly, we find that the remaining Defendants are entitled to qualified immunity.  Defendant Clark's decision not to house the Plaintiff in the Bedford County facility is supported by a rational explanation, concern for Plaintiff's safety, ability to safely and adequately manage the prison in light of those safety concerns and personal connections between the Plaintiff and several of the Bedford County prison's staff, which Defendant Clark believed might induce some personnel to relax prison procedures and protocol when dealing with Plaintiff.  Defendant Clark explained that due to a population level at the Bedford facility that was close to capacity, it would be difficult for him to maintain the smooth functioning and safety of this facility in light of these threats against Plaintiff and potential conflicts of interest.  Doc. 92.  Plaintiff provides no evidence upon which a contrary conclusion could be based – again, Plaintiff has numerous conclusions to offer but no factual foundation for those conclusions.

In addition, as stated, Plaintiff has not established even the barest supporting factual allegations that there was a custom or policy of Bedford County Prison Board which was responsible for/caused a violation of Plaintiff's rights, such that liability accrues pursuant to 42 U.S.C. 1983.

Further, although Plaintiff complains that he was treated differently from other inmates in that he was kept past the minimum 90 days of his sentence, we find that there is no evidence to suggest that

---

[5]  Plaintiff alleges that either Attorney Bailey or Attorney [ ] probably know the name of the commanding officer that allegedly asked Attorney [ ] to leave when she came to visit Plaintiff at the Adams County facility.  Doc. [ ].  However, Plaintiff has not even supplied an affidavit by either of those individuals.  Discovery has taken place, and we would expect some type of evidentiary support to this allegation in the face of a Motion for Summary Judgment.

this was in retaliation for his attempts to defend himself. We note that work release is a privilege, not a

right, and that state prison facilities are not required to house an inmate in the location that the inmate

believes is most convenient for him or her in terms of participating in work release. As stated supra,

Defendants have adequately explained a reasonable motivation for housing Plaintiff in a facility other

than Bedford County. Further, we find that Defendant Judge George's direction to Defendant Clark to

seek the return of Plaintiff to the Bedford County correctional facility upon learning that the terms of

Plaintiff's sentence, which were entered by Judge George's Court Order on March 2, 2005 were not

being observed (for whatever reason) is a judicial function. In fact, it seems clear from the record that

the decision not to house Plaintiff in the Bedford County facility was made for Plaintiff's own good,

and subsequent transfers between Clinton, Cambria and Adams were the result of actions initiated by

the Plaintiff. Plaintiff again only offers conclusions rather than facts to counter these findings.

    As for allegations that Defendant Higgins and/or Clark spoke to newspaper reporters, we find

that there is no constitutional issue in this claim. If true, this behavior would certainly be ill-befitting

the office of District Attorney and/or Warden, however there is absolutely no evidence in the record to

support this – only bare allegations. Similarly, there is absolutely no evidence presented to suggest

that Defendant Higgins personally called Pennsylvania State Troopers to order the detention of

Plaintiff prior to Plaintiff's deadline surrender time and date (after Plaintiff's bail had been revoked by

court order). Even if he had done so, it is doubtful that this would have had any effect, and there

certainly is no evidence that it *did* have any effect, as Plaintiff acknowledges that he surrendered

himself by the deadline ordered. Doc. 42. The allegation that Defendant Higgins called the Bedford

Gazette so that reporters would be waiting when Plaintiff surrendered himself is also disturbing, and if

true again indicates actions ill-befitting a public official; however, while we would deplore such

behavior, if true, 1) we have no evidence of it in the record at all, even after discovery; 2) this would

not constitute a violation of constitutional law; and 3) the conviction was presumably a matter of public record; any added notoriety would seem to be minimal.

In addition, the charge that prison personnel threw out a birthday card to Plaintiff from his three-year-old daughter is very sad to contemplate and unfortunate if true. However, this does not amount to a custom or policy. Lastly, decisions over whether to allow prison inmates to wear jewelry are very fact-specific inquiries; issues of safety for both the prisoners and prison personnel are present in this type of decision-making. We can easily see a rational explanation for disallowing the use of necklaces and pendants by prisoners.

In short, based on the pleadings and discovery divulged to this Court, we find that there has been no constitutional violation of Plaintiff's rights. Further, even if we were to find that the inconveniences claimed by Plaintiff *did* amount in whole to a violation of Plaintiff's constitutional rights under the First or Fourteenth Amendment, the Due Process Clause, and/or the Equal Protection Clause, we would find that the Defendants in this case were entitled to qualified immunity. Under an objective analysis, a reasonable person in the shoes of any of these individual Defendants, would have believed that he was not violating a clearly established law.[6] There also has been no unconstitutional policy or practice established.

---

[6] Although, it does seem from the bare allegations made that Defendant Higgins walked dangerously close to the line between what a reasonable person might have expected was legal and illegal. However, again, there is no factual evidence, even post-discovery, to support these allegations. More importantly, Plaintiff has suffered no cognizable harm as a result such that he could defeat a qualified immunity defense. There is no evidence that state troopers followed Defendant Higgins' instructions to pick up Plaintiff when his bail was revoked, if indeed Defendant Higgins did make that call. Further, although Plaintiff alleges that Defendant Higgins had Plaintiff followed by Pennsylvania State Trooper Hershey, who arrested Plaintiff for driving while intoxicated, there is no evidence to this effect and Higgins certainly was not responsible for Plaintiff's drinking and getting behind the wheel. Plaintiff served 105 days under a minimum sentence of 90 days and a possible maximum of one day less than five years. Further, he was safely housed while in prison, which most decidedly is a concern that takes precedence over that of work release or the location of his incarceration. Defendants had nothing to do with his attorney missing the deadline for Plaintiff's Driving After Imbibing conviction, and revocation of bail by Defendant Judge George at the expiration of this deadline was standard practice. Further, it is clear that much of Plaintiff's transfer from prison to prison was the result of his own initiatives due to dissatisfaction over not being able to participate in work release in the manner he desired.

## VIII.  CONCLUSION

Therefore, Defendants' Motions for Summary Judgment (Docs. 89 and 93) are **GRANTED**.

An appropriate order follows.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

DOUGLAS GOLDHABER, )
)
Plaintiff, )
)
                )   CIVIL ACTION NO. 3:06-134
   v. )   JUDGE KIM R. GIBSON
)
WILLIAM HIGGINS, BRIAN CLARK, )
KEITH BOWSER, MICHAEL GEORGE, )
BEDFORD COUNTY PRISON BOARD, )
)
        Defendants. )

## ORDER

**AND NOW**, this 31st day of March, 2011, this matter coming before the Court on Defendant George's Motion for Summary Judgment (Doc. No. 93) and Defendants Higgins, Clark, Bowser, and Bedford County Prison Board's Motion for Summary Judgment (Doc. No. 89), **IT IS HEREBY ORDERED** that the Motions for Summary Judgment are **GRANTED**.

BY THE COURT:

**KIM R. GIBSON,**
**UNITED STATES DISTRICT JUDGE**

28